# United States Court of Appeals
## For the First Circuit

Nos. 05-2150; 05-2208

JOHN J. JANEIRO, JR.,

Plaintiff, Appellee/Cross-Appellant,

v.

UROLOGICAL SURGERY PROFESSIONAL ASSOCIATION; UROLOGICAL SURGERY
PROFESSIONAL ASSOCIATION MONEY PURCHASE PENSION PLAN AND TRUST;
UROLOGICAL SURGERY PROFESSIONAL ASSOCIATION PROFIT SHARING PLAN
AND TRUST; EDWARD A. CHIBARO, M.D.,

Defendants, Appellants/Cross-Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

[Hon. Paul J. Barbadoro, U.S. District Judge]

Before

Torruella, Circuit Judge,
Hug,* Senior Circuit Judge,
and Lynch, Circuit Judge.

Alexander J. Walker, Jr., with whom Danielle L. Pacik, Jeanneane N. Osborne, and Devine, Millimet & Branch, P.A. were on brief, for appellants/cross-appellees.
Thomas J. Donovan, with whom McLane, Graf, Raulerson & Middleton Professional Association were on brief, for appellee/cross-appellant.

August 7, 2006

---

* Of the Ninth Circuit, sitting by designation.

**LYNCH**, **Circuit Judge**. This is a case arising under the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. §§ 1001-1461. After a bench trial, plaintiff John J. Janeiro, Jr. was awarded $195,036 in benefits, a sum that the district court held had been wrongfully withheld from him by two retirement plans. The plans were administered by the Urological Surgery Professional Association (USPA), and their primary trustee was Edward A. Chibaro, Janeiro's former business partner.

On appeal, the main issue is what standard of review the district court should have applied to the benefits claim in evaluating the defendants' decisionmaking. The standard varies, depending on whether there was a conflict of interest. Defendants argue that they were entitled to greater deference from the court as to their repeated revaluations of, and delay in paying, the amount due to Janeiro. We disagree. On these facts, the district court properly engaged in plenary review, in light of the conflict of interest of the plans' trustee, Chibaro. It then correctly found for plaintiff on his benefits claim.

For his part, Janeiro has cross-appealed, seeking attorneys' fees and prejudgment interest. We hold that the district court did not abuse its discretion in denying these requests. In sum, both the appeal and the cross-appeal fail. The judgment of the district court is affirmed in all respects.

I.

Background

We describe the facts in the light most favorable to the judgment, drawing all reasonable inferences from the record in favor of Janeiro as to the benefits claim, but in favor of defendants as to attorneys' fees and prejudgment interest. See Servicios Comerciales Andinos, S.A. v. Gen. Elec. Del Caribe, Inc., 145 F.3d 463, 466 (1st Cir. 1998); Wainwright Bank & Trust Co. v. Boulos, 89 F.3d 17, 19 (1st Cir. 1996). Our summary is based largely upon the district court's factual findings, in which we see no clear error.

A.      The Plans

For over a decade, Janeiro was an employee of the USPA, a medical practice. He and Chibaro, both doctors, were co-owners of the practice. The USPA was, and still is, the sponsor and administrator of two pension benefit plans governed by ERISA: the Money Purchase Pension Plan and Trust, and the Profit Sharing Plan and Trust. Janeiro participated in both plans.

The Money Purchase Plan was funded by contributions from employees' salaries, and the Profit Sharing Plan was funded by a combination of employee and employer contributions. Both plans were defined contribution, pooled asset plans. Both plans consisted of several documents -- a Prototype Plan, an Adoption Agreement, a Trust Agreement, and a Summary Plan Description --

that are, in all relevant respects, identical for each plan.

The pertinent terms created by the documents are these: First, § B.5.1 of each plan's Adoption Agreement provides that "[t]here are no restrictions other than those of Article 10 in the [Prototype Plan] on when, following termination of employment, a participant may begin receiving benefits." Article 10 of the Prototype Plan, in turn, provides in § 10.1(b) that "[u]nless a participant elects otherwise . . . , benefit distribution occurs (or begins) no later than the sixtieth day following the end of the plan year in which . . . [the participant] terminates his employment with the employer." No other provision of Article 10 is pertinent here.

Section B.5.1 of each plan's Adoption Agreement provides that "[w]hen an account balance becomes payable, it is paid in a lump sum at the valuation date following the occurrence precipitating the disbursement." Under § B.4.1, "[v]aluation dates occur at the end of each plan period." The "plan period" was the same as the "plan year": the calendar year, ending on the last day of December.

Section 6.2 of the Prototype Plan provides: "Accounts are adjusted to reflect investment changes on each adjustment date. . . . Each valuation date is an adjustment date. The plan administrator may also provide for an extraordinary adjustment date

whenever market values of underlying assets have changed so much that it would be inequitable to do otherwise."

Finally, under § 21.1 of the Prototype Plan, "[t]he principal employer is the plan administrator" and "has discretionary authority to determine eligibility for benefits and to construe the terms of the plan."

This lawsuit concerns benefits under both plans. For convenience, we refer to both as "the plan," the usage adopted by the district court.

Chibaro was listed on the plan as the individual trustee. Although Janeiro was named co-trustee in 1999 and signed some documents in that capacity, the district court found that he "was a trustee in name only," and that Chibaro was the one who "exclusively exercised" both the responsibilities of trustee and the USPA's responsibilities of plan administration. "In particular," the court found, "it was Dr. Chibaro who was exclusively responsible for interactions with both the plan's investment advisor and the third[-]party administrator."

The plan's third-party administrator was Fecteau Associates, Inc. ("Fecteau"). Fecteau handled the annual valuation of plan assets. It generated this information using a census form it sent to the USPA every December or January; a statement, obtained from the plan's investment advisor, of the value of the assets in the plan as of December 31; and other information,

concerning developments such as deposits and withdrawals, obtained from the USPA during the ordinary course of the year. The court found that it took the USPA roughly two hours to complete the census, and that it took five to ten hours for Fecteau to complete the valuation once it had all the information.

B.        The Business Breakup and the Benefits Dispute

In July of 2000, Janeiro gave notice that he intended to leave the USPA. Thereafter, the relationship between Janeiro and Chibaro was, in the district court's words, "cold and at times very contentious." In October of 2000, Janeiro terminated his employment. The next valuation date, which would apply in the ordinary course, was December 31, 2000.

The district court found that both before and after December 31, 2000, Janeiro "clearly and repeatedly communicated his intention to Dr. Chibaro . . . to withdraw his plan assets as soon as they could be withdrawn." In addition, several other terminated employees and Chibaro's ex-wife, claiming by way of a recent divorce, sought to obtain their share of assets as of the December 31, 2000 valuation date. In all, Chibaro knew that as of that date roughly 70% of the plan's assets would be departing. Of the 30% remaining, 92% belonged to Chibaro.

The district court further found that the USPA had Fecteau's 2000 annual census form in early January of 2001, but did not complete and return it to Fecteau until March 12, 2001.

-6-

Fecteau completed the valuation for December 31, 2000 (the first valuation) and transmitted it to Chibaro by letter dated June 19, 2001. Janeiro's share of assets as of December 31, 2000 was valued at $651,680.

Importantly, between December of 2000 and June of 2001, the market value of the plan assets declined. The district court found that Chibaro "became concerned because . . . he didn't want to make money for other people that were leaving the plan, and in effect if Dr. Janeiro were to be paid the valuation as of December 31, 2000, he would receive a greater percentage of the plan assets than he would be entitled to if a new valuation was conducted." Chibaro, who "was determined to have the assets revalued," directed Fecteau to revalue the assets, this time as of June 30, 2001 (the second valuation). Fecteau did so, conveying the results to Chibaro on August 10, 2001. This time, Janeiro's share was valued at $603,052. As the district court explained, the effect of the revaluation "was to transfer a loss that otherwise would have been born[e] by the parties whose assets remained in the plan to the parties who were leaving."

At some point after August 10 and before September 11, 2001, consent-to-distribution forms were distributed to Janeiro and the other claimants. Janeiro returned his completed form on September 17, 2001. By then, the market had further declined, most notably after September 11, 2001. Chibaro had Fecteau perform

another revaluation, this time as of October 31, 2001 (the third valuation); the results were communicated to him on November 5, 2001. He did not notify the terminated employees about this revaluation until November 30, and he did not provide them with consent-to-distribution forms (which would have specified the value of their shares).

December 31, 2001 was the end of the plan year, and so was a valuation date. The valuation as of December 31, 2001 (the fourth valuation) was transmitted to Chibaro on April 30, 2002.[1] In April of 2002, consent-to-distribution forms were distributed, but this time Janeiro did not sign or return his.

On July 19, 2002, Fecteau transmitted to Chibaro a valuation as of June 30, 2002 (the fifth valuation). Consent-to-distribution forms were sent to the departing employees; Janeiro completed his and returned it on August 11, 2002. The value of Janeiro's share, as of this valuation, was $456,644. He received this sum -- $195,036 less than the first valuation -- by late fall of 2002, nearly two years after the first valuation date of December 31, 2000. He unsuccessfully sought to recover this $195,036 amount through administrative means.

---

[1] Defendants emphasize one incident that occurred in the meantime: in mid-January 2002, Janeiro directed Smith Barney, the custodian of the plan assets, not to make further distributions. The assets remained frozen until mid-April 2002. Whether or not the freeze might in other circumstances have justified a delay in distribution and even revaluation, it came too late here: defendants' case founders at the very first revaluation.

Janeiro then sued the USPA, the two plans, and Chibaro. He asserted four claims. The first two, for benefits, see 29 U.S.C. § 1132(a)(1)(B), and for equitable relief and restitution for breach of fiduciary duty, see id. § 1132(a)(3), were essentially theories of recovery for the $195,036. The third was for prejudgment interest, and the fourth was for attorneys' fees.

C.      The District Court's Bench Ruling

At the end of a three-day bench trial, the district court made findings of fact, most of which are summarized above. The court further determined that Chibaro was in breach of his fiduciary duty in two ways: First, Chibaro was aware as of December 30, 2000 that a substantial amount of the assets, having been claimed by the departing participants, would (or should) shortly be leaving the plan, but he failed to apprise the plan's investment advisor of this fact so that the advisor could liquidate and segregate sufficient plan assets. This failure meant that "the assets remained invested in a mixture of stocks and bonds[,] which exposed the assets to be distributed to an unacceptable degree of market risk." Second, Chibaro "failed to take reasonable steps to ensure that the [December 31, 2000] valuation was completed in a timely manner" by promptly transmitting the census to Fecteau and insisting that Fecteau timely do its job. The six-month delay simply was not justified.

Taken together, these fiduciary breaches led to otherwise avoidable losses: market losses traceable to the departing assets, which had not been liquidated and segregated, but rather had remained in risky investments. This particular category of losses, as distinct from the market losses traceable to the remaining assets, was "due entirely and exclusively" to Chibaro's fiduciary breaches. The court found that Janeiro was not at all responsible for the breaches or the losses. The court also declined to find that Chibaro relied in good faith on the advice of professionals, noting that, if anything, the evidence tended against such a finding.

The district court then made the following conclusions of law: First, Chibaro and the USPA were entitled to judgment as a matter of law on the claim for damages based on a breach of fiduciary duty theory, because such a claim does not lie where, as here, the suit is only on behalf of a claimant who has an available claim for benefits. See Varity Corp. v. Howe, 516 U.S. 489, 515 (1996). The court stressed that although Janeiro was not legally entitled to any relief on a breach of fiduciary duty theory, Chibaro was in fact in breach of his fiduciary duty.

Second, the court held, Janeiro was entitled to prevail on his benefits claim. The court reasoned that Janeiro's account balance became payable on the valuation date following his termination -- that is, on December 31, 2000 -- and that Janeiro

had timely elected such payment. Further, the amount to which Janeiro was entitled was the value of his account on December 31, 2000, unless some departure from that valuation date was justified. The court agreed with defendants that § 6.2 of the Prototype Plan, which permitted the plan administrator to "provide for an extraordinary adjustment date whenever market values of underlying assets have changed so much that it would be inequitable to do otherwise," supplied a potential basis for departure. The ultimate question, therefore, was whether Chibaro, exercising the USPA's plan administration authority, was entitled to declare extraordinary adjustment dates on June 30, 2001 and on later dates.

In answering this question, the court first determined the appropriate standard of review of defendants' application of the plan's terms. The court acknowledged that ordinarily it would review only for abuse of discretion, but it held that in this case, "Chibaro [was] operating under a conflict of interest that was so severe . . . that it entitles his determinations" to no deference. The court cited several facts supporting this conclusion.

First, Chibaro's judgment as to whether to employ an extraordinary valuation date was "inevitably going to be affected by a concern . . . that he could be subject to suit for breach of fiduciary duty." It was his failures to timely liquidate and segregate plan assets, and to obtain a December 31, 2000 valuation that produced avoidable losses -- that is, market losses traceable

-11-

to the departing assets, which should have been isolated from market risk and given to the departing participants. Using a later valuation date (with a lower value) would put these avoidable losses on the departing participants and thus reduce the risk that anyone remaining in the plan would sue for breach of fiduciary duty. Second, the district court noted, Chibaro felt personal animus toward the departing participants. By June of 2001, he "was in a highly adversarial relationship with the departing employees," including the office manager, with whom he had a "very hostile relationship," and Janeiro, with whom he was then engaged in state-court litigation. It was Janeiro who had commenced that litigation, and the district court found that "there was animosity between them as a result of this litigation." As mentioned above, one of the other owners of the departing assets was Chibaro's ex-wife, claiming by way of a recent divorce. The court found that Chibaro "did not want to make money for people who were leaving the plans," and that he "harbor[ed] an animus against [them] sufficient to amount to conflict of interest."[2]

---

[2] The district court did find that animus was not the motive in Chibaro's <u>original</u> fiduciary breaches of failing to promptly liquidate and segregate assets and to timely see that the December 31, 2000 valuation was completed. But then losses began to mount as a result of the breaches, and Chibaro, in deciding whether to <u>revalue</u>, began to be "motivated in part" by a desire not to, as he saw it, "enrich" the departing participants. (Even then, the court found, his primary purpose was simply to avoid losing his own money.)

Third, Chibaro's personal financial interests were set directly against those of the departing participants. The court found that because he owned 92% of the remaining assets (that is, of the 30% remaining), "he would be the principal beneficiary" of a decision to revalue.

Reviewing the revaluation decisions de novo under the plan terms, the court ruled that Chibaro "was not entitled to declare an extraordinary valuation date either as of June 30, 2001 or [on] any of the subsequent dates." The court described this as a "very difficult question." It reasoned that even if Chibaro had not been the principal beneficiary of revaluation, it still would have been inappropriate to declare an extraordinary valuation date. This was because revaluing did not "equitably allocate" the avoidable losses caused by Chibaro's fiduciary breaches "among all of the assets," but rather completely shifted all of those losses "from the plan participants whose assets . . . remain in the plan, . . . to plan participants whose assets are leaving the plan."

The court cited several reasons for rejecting defendants' argument that the consequence of not revaluing -- namely, leaving all of the avoidable losses caused by Chibaro's fiduciary breaches on the remaining participants -- justified their course of action. First, the market decrease between the first and second valuations, roughly 7.5% in six months, was "not unusual at all," and causing the remaining assets to bear the full amount of losses (including

losses traceable to the departing assets) would not have been "so unusual or substantial as to cause a failure to revalue to be inequitable." Second, revaluing delayed the distribution of funds. Third, shifting all of the avoidable losses caused by the breaches onto departing participants was not more fair, because "[t]he fairest place to leave the consequence[] of the fiduciary breach under these circumstances is where it lies" as a result of the breach -- that is, with the remaining plan assets. The court explained that the remaining participants injured by the breach have recourse against, and can recover from, the administrator.

Lastly, the court noted, Chibaro owned 92% of the remaining assets, meaning that the primary effect of revaluation would be to shift losses from "the wrongdoer" to "innocent parties" departing the plan. Not revaluing would simply have left the losses from Chibaro's fiduciary breaches to fall almost entirely on "the wrongdoer" himself and would not have been inequitable.

The court thus found that the June 2001 revaluation was inappropriate, and that Janeiro had a right to his benefits as valued as of December 31, 2000. He was therefore entitled to recover $195,036 -- the difference between the initial valuation and the amount that he had actually been paid to date.

The court then heard oral argument on attorneys' fees and prejudgment interest and, after determining that it had discretion

-14-

as to both matters, denied both.[3]  As for attorneys' fees, the court cited the five-factor test described in Cook v. Liberty Life Assurance Co., 334 F.3d 122, 124 (1st Cir. 2003), and it determined that each factor cut in favor of defendants: first, Chibaro did not act in bad faith, but instead believed that he was permitted under the law to act as he did; second, the plan did not have deep pockets, but rather had no more than $500,000 in assets, of which nearly $200,000 was already being awarded to Janeiro; third, an award was not necessary for deterrence purposes; fourth, an award coming at the expense of the remaining plan participants, who (except for Chibaro) were innocent, would be inappropriate; and fifth, this was a close case.

As for prejudgment interest, the court emphasized its concern about the effect such an award would have on the plan.  It added that in its view, "much the same factors that influence an award of attorney's fees here should apply in a pre-judgment interest situation," and that those same factors indicated that an award of prejudgment interest was not warranted.

## II.

### The Benefits Claim (Defendants' Appeal)

In reviewing a judgment following a bench trial, we accept the district court's findings of fact unless they are

---

[3] The court did award post-judgment interest and costs to Janeiro.

-15-

clearly erroneous, keeping in mind that the district judge had the opportunity to assess the credibility of the witnesses. Fed. R. Civ. P. 52(a). "[W]e may not disturb the district court's record-rooted findings of fact unless on the whole of the evidence we reach the irresistible conclusion that a mistake has been made." Smith v. F.W. Morse & Co., 76 F.3d 413, 420 (1st Cir. 1996). "This deferential standard extends . . . to inferences drawn from the underlying facts," and "if the trial court's reading of the record [with respect to an actor's motivation] is plausible, appellate review is at an end."[4] Id. We review conclusions of law de novo, id., and the parties are in agreement that this de novo review extends to the district court's ultimate decision as to which standard of review applied to defendants' own decisions.

A.        Standard of Review of Revaluation Decisions

The heart of defendants' argument is that the district court should not have applied de novo review to their decisions. They raise two arguments based on the fact that the plan vested the USPA, the plan administrator, with discretionary authority: First, they say, the plan administrator did not operate under a conflict of interest, so the usual highly deferential standard of review

---

[4] On appeal, defendants ignore and even contradict many of the district court's adverse findings of fact. Defendants present no developed argument in support of most of their version of the facts. We therefore do not mention their version, except to the extent they have developed it on appeal by presenting something approaching a clear-error argument.

should apply.  Second, they argue, even the existence of a genuine conflict of interest should only have added some bite to the review, without making it wholly nondeferential.  These arguments fail in light of the particular facts of the case.

Where the terms of an ERISA plan give discretion to the plan administrator to make benefits decisions and to construe the terms of the plan, the district court ordinarily should uphold such determinations by the administrator unless they constitute an abuse of discretion, or are arbitrary and capricious.  See Wright v. R.R. Donnelley & Sons Co. Group Benefits Plan, 402 F.3d 67, 74 & n.3 (1st Cir. 2005); Leahy v. Raytheon Co., 315 F.3d 11, 15 & n.3 (1st Cir. 2002).  As this court has repeatedly made clear, however, "[i]t is well settled that when a plan administrator labors under a conflict of interest, courts may cede a diminished degree of deference -- or no deference at all -- to the administrator's determinations."  Leahy, 315 F.3d at 16 (emphasis added); see also Wright, 402 F.3d at 74 (quoting the same language from Leahy).

As for whether there was a conflict of interest, defendants first attack the role Chibaro's 92% ownership of the remaining assets played in the district court's analysis.  They invoke the rule that structural conflicts alone -- those arising from the administrator's or trustee's own financial interests -- are not sufficient to abandon the normal highly deferential review.  See Wright, 402 F.3d at 75 (fact that plan administrator was also

plan insurer did not, by itself, alter normal "arbitrary and capricious" standard of review); Mahoney v. Bd. of Trs., 973 F.2d 968, 971-73 (1st Cir. 1992) (applying "arbitrary and capricious" standard of review where "trustees exercised clearly granted discretion to benefit one group of beneficiaries more than another, and the trustees benefited from that action as members of the much larger, favored group"). This rule makes sense because, where the potential conflict arises solely from the fact that any payment of benefits will come at the decisionmaker's expense, market forces can generally be expected to mitigate undue stinginess. See Doyle v. Paul Revere Life Ins. Co., 144 F.3d 181, 184 (1st Cir. 1998); Wright, 402 F.3d at 75.

The district court's decision is entirely consistent with the rule that a structural conflict by itself does not provide a basis for departing from the usual standard of review. The court did not rely solely on the structural conflict arising from Chibaro's financial interest, but rather cited additional factors present in this case. These additional factors made it especially likely that Chibaro's personal financial interest played a real role in the decisions to revalue, and they showed in their own right that the decisions were actually "improperly motivated." Doyle, 144 F.3d at 184; see also Wright, 402 F.3d at 75-78 (considering various factors allegedly showing improper motivation, in addition to structural considerations, as possible bases of

-18-

conflict of interest); Pari-Fasano v. ITT Hartford Life & Accident Ins. Co., 230 F.3d 415, 419 (1st Cir. 2000) (distinguishing between "potential" or "possible" conflicts of interest arising from structural considerations and cases where the circumstances actually "indicate[] an improper motivation").

Defendants' attacks on the other two factors cited by the district court are also unavailing. As for the conflict based on Chibaro's fear of litigation stemming from his earlier fiduciary breaches, defendants claim that "[t]here is simply no evidence that the prospect of litigation factored into Dr. Chibaro's decision to revalue." They assert that there simply was no prospect of a lawsuit, and if there was, Chibaro was neither aware nor afraid of it.

First, defendants say, none of Chibaro's professional advisors told him he was obliged to liquidate and segregate assets sufficient to pay the imminently departing plan participants, and the first decision to revalue was based solely on the advice of professionals, not on the possibility of liability for any failure to liquidate and segregate. But the district court found that Chibaro failed to inform the investment advisor in the first place that a significant exodus was imminent, found that it was Chibaro who was "determined to have" a revaluation and who "directed" that one occur, and expressly refused to find that he relied in good faith on the advice of professionals. The defense of good-faith

reliance on advice is not available to one who omits to disclose material information to advisors or dictates imprudent outcomes to advisors.[5] Cf. United States v. Rice, 449 F.3d 887, 897 (8th Cir. 2006) (defendant not entitled to advice-of-counsel defense where he neither "fully disclosed all material facts to his attorney before seeking advice" nor "actually relied on his counsel's advice in the good faith belief that his conduct was legal").

Second, defendants argue, there was "no evidence" that Chibaro feared liability stemming from the six-month delay in completing the first valuation. They say that annual valuations were generally completed in April because it took the USPA time to determine the amount of its contribution to the Profit Sharing Plan, and that several months passed after the USPA submitted the census form to Fecteau before Fecteau completed the valuation. Taking these points in reverse order, we note that the delay once

_____

[5] William Prizer, the investment advisor, testified that Chibaro never told him when Chibaro expected to do a distribution, that Prizer was given "the clear understanding that this wasn't . . . going to happen any time soon," and that if Prizer had been told there would "be a payout date in December," he "[a]bsolutely" would have advised that more plan assets be put into cash-like investments to minimize risk. We do not consider the claim, raised for the first time at oral argument and without record citation, that Prizer knew about the imminent departure of 70% of the assets because he was also Janeiro's personal investment advisor.
Thomas Fecteau, of the third-party administration firm, testified that it was Chibaro's idea to revalue instead of paying the departing participants based on the December 31, 2000 valuation, and indeed that Chibaro was "adamant" about revaluing. Fecteau further testified that he did not make a recommendation "one way or the other" as to revaluation.

the census was in Fecteau's hands was attributable to Chibaro, who should have ensured promptness on Fecteau's part; that an arguably justified delay as to one plan does not justify a delay as to the other plan; and that habitual delays in valuation of four months, not conclusively shown to be justified to begin with, are hardly conclusive proof that a delay of half a year -- for work that should take a matter of hours or days -- was justified.

The evidence, in sum, supported a finding that Chibaro was at fault for failure to timely liquidate and segregate sufficient assets and for failure to ensure that the first valuation was timely completed. It was also plausible to find that there was a prospect of litigation by the remaining participants (aside from Chibaro himself), who would bear the full costs of Chibaro's failures if no revaluation was done. And it was plausible to infer that Chibaro must have been aware of and feared this prospect of litigation, and that this played a role in his decision to revalue.

With respect to the district court's finding that Chibaro harbored animus toward the departing participants, defendants offer no contrary factual argument. They rely instead on a non sequitur: that Chibaro had a fiduciary duty to protect the financial interests of all plan participants, including the remaining ones. There is no doubt Chibaro had a legal duty to the remaining

participants.[6] But that duty did not necessarily motivate in whole or even in part his decision to revalue, nor did it make it factually impossible for him to have been motivated by animus. The district court expressly found Chibaro not credible with respect to his claim that, in directing each revaluation, he was trying to protect the other participants (aside from himself) remaining in the plan. Further, the relationship between Chibaro and the departing participants was plainly acrimonious, and we have no reason to doubt that there was animus and that it played a role in Chibaro's decision to revalue.

Finally, we reject defendants' fallback argument that even if there was a conflict of interest, the district court should have applied arbitrary and capricious review with "bite" but without ruling out all deference. We have repeatedly stated that "when a plan administrator labors under a conflict of interest, courts may cede a diminished degree of deference -- or no deference at all -- to the administrator's determinations."[7] Leahy, 315 F.3d

---

[6] As we explain in the text, it is less clear than defendants think that this duty required, or even permitted, revaluation here.

[7] The decisions on which defendants rely do not mandate a different approach. None involved a finding of a severe conflict based partly on actual improper motivations such as animus. See Fenton v. John Hancock Mut. Life Ins. Co., 400 F.3d 83, 90 (1st Cir. 2005) (arbitrary and capricious review proper in absence of showing that "adverse determination was improperly motivated"); Lopes v. Metro. Life Ins. Co., 332 F.3d 1, 4-5 & n.6 (1st Cir. 2003) (refusal to apply de novo review proper where there was structural conflict and evidence of improper motivation was "not particularly convincing" and revealed "nothing untoward");

at 16 (emphasis added); see also Wright, 402 F.3d at 74.

The district court's approach was consistent with the Supreme Court's statement that "if a benefit plan gives discretion to an administrator or fiduciary who is operating under a conflict of interest, that conflict must be weighed as a 'facto[r] in determining whether there is an abuse of discretion.'" Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989) (alteration in original) (quoting Restatement (Second) of Trusts § 187 cmt. d (1959)); see also Wright, 402 F.3d at 74 ("In applying the arbitrary and capricious standard . . . the existence of a conflict of interest on the part of the administrator is a factor which must be considered."). In some cases, the conflict is so severe that giving it sufficient weight as a "factor" (or applying the level of "bite" necessary to account for the severity of the actual conflict) requires giving no deference to the conflicted decisionmaker. Given the severe conflict of interest under which Chibaro was laboring, the district court properly gave no deference to the decisions he made in exclusively exercising the USPA's plan administration authority.

B.      Correctness of Revaluation Decisions

---

Pari-Fasano, 230 F.3d at 419 (arbitrary and capricious review where there was structural conflict but not actual improper motivation); Doyle, 144 F.3d at 184 (in case of structural conflict, applying arbitrary and capricious review with "more bite," and "interpreting 'more bite' as adhering to the arbitrary and capricious principle, with special emphasis on reasonableness, but with the burden on the claimant to show that the decision was improperly motivated").

The defendants argue the belated revaluations were proper under the provision allowing the administrator to "provide for an extraordinary adjustment date whenever market values of underlying assets have changed so much that it would be inequitable to do otherwise." The district court did not err in finding that this provision did not apply and that it provided no basis to deny the benefits sought. Defendants purport to justify all the revaluations on the ground that they were "necessary to ensure that the market losses that occurred after December 31, 2000 were borne equally by all plan participants." For the exact reasons stated by the district court, this is an inadequate explanation.

First, the district court found that the 7.5% market decrease during the six months following December 31, 2000 was "not unusual at all," and that not revaluing would not have put an especially large burden on the remaining assets (the loss to the remaining assets would have been roughly 25%). Defendants have not shown that this essentially empirical analysis, in the context of a plan provision for "extraordinary" adjustment dates, was wrong.

Second, the revaluations did distribute "market losses" equally among all plan participants, but they did not distribute the losses attributable to Chibaro's fiduciary breaches equally among all participants. The market losses that occurred after December 31, 2000, to the extent they are traceable to the departing assets, should not have occurred to begin with. Those

-24-

assets should not have been in risky market investments after December 31, 2000, and the losses traceable to them were the direct result of Chibaro's fiduciary breaches in failing to timely liquidate and segregate plan assets, and to obtain valuations. The effect of revaluation was to put all of the loss caused by these fiduciary breaches on the departing participants. Keeping in mind that the plan allowed for extraordinary revaluations only "whenever . . . it would be inequitable to do otherwise," equity hardly demanded that this entire loss be put on the departing participants.[8]

Not revaluing would simply have left all of the avoidable losses due to Chibaro's fiduciary breaches on the remaining participants. Importantly, the vast majority (92%) of the assets that would have been left to absorb the losses from Chibaro's fiduciary breaches belonged to Chibaro himself. It would not have been inequitable for him to bear the brunt of the losses he wrongfully caused.[9]

---

[8] Defendants characterize revaluation as necessary to prevent the departing participants from "obtaining a windfall" at the expense of the remaining participants. It is difficult to see how not being forced to bear the entirety of losses that never should have occurred in the first place, while the remaining participants bear none, can be labeled a "windfall."

[9] Defendants suggest that because the district court had ruled out a theory of recovery based on breach of fiduciary duty, it was somehow improper, or an "end-run around ERISA," to consider Chibaro's actual fiduciary breaches, which preceded the revaluations, in assessing the equities of revaluing. This argument makes little sense, but as it is unsupported by any

Whatever the force of defendants' argument about the clause in the abstract, defendants acted as though it permitted unlimited retention of assets, keeping the assets of departing participants for nearly two years and performing a total of five valuations. The clause may not reasonably be read that way.

## III.

### Attorneys' Fees and Prejudgment Interest
### (Plaintiff's Cross-Appeal)

Janeiro's cross-appeal challenges the district court's denial of attorneys' fees and prejudgment interest.

### A.      Attorneys' Fees

ERISA provides that attorneys' fees are available in the court's discretion. See 29 U.S.C. § 1132(g)(1). We review the denial of attorneys' fees only for abuse of discretion, "disturb[ing] such rulings only if the record persuades us that the trial court 'indulged a serious lapse in judgment.'" Cottrill v. Sparrow, Johnson & Ursillo, Inc., 100 F.3d 220, 223 (1st Cir. 1996) (quoting Texaco P.R., Inc. v. Dep't of Consumer Affairs, 60 F.3d 867, 875 (1st Cir. 1995)). We see no abuse of discretion.

We begin by noting that "in an ERISA case, a prevailing plaintiff does not, merely by prevailing, create a presumption that

---

citations to authority, we simply deem it waived. We reject the claim that even if the breaches could be considered, the district court "placed undue emphasis" on them and on Chibaro's ownership interest in the remaining assets. The court's weighing of these factors, along with others, was perfectly sensible.

-26-

he or she is entitled to a fee-shifting award." Id. at 226. This is an area of law that should be, and is, flexible. Id. at 225-26.

Although "fee awards under ERISA are wholly discretionary," this court has listed five factors that ordinarily should guide the district court's analysis:

> (1) the degree of culpability or bad faith attributable to the losing party; (2) the depth of the losing party's pocket, i.e., his or her capacity to pay an award; (3) the extent (if at all) to which such an award would deter other persons acting under similar circumstances; (4) the benefit (if any) that the successful suit confers on plan participants or beneficiaries generally; and (5) the relative merit of the parties' positions.

Cottrill, 100 F.3d at 225. This list is illustrative, not exhaustive, id.; no single factor is dispositive; and indeed, not every factor in the list must be considered in every case. Twomey v. Delta Airlines Pilots Pension Plan, 328 F.3d 27, 33 (1st Cir. 2003).

As for the first factor, the district court was not obliged to find that defendants acted with an especially high degree of culpability. It was plausible, in evaluating whether to award attorneys' fees, to find that Chibaro subjectively thought he was entitled to administer the plan as he did.

Analyzing the second factor, the district court expressed a legitimate concern that the plan's assets were quite modest and

-27-

were already subject to a benefits award comprising at least two-fifths, and perhaps as much as two-thirds, of the total assets.[10]

Janeiro adds that even though "the district court ruled in favor of USPA and Dr. Chibaro as to Dr. Janeiro's claims against them," Chibaro's and the USPA's assets should still be fair game for an award of attorneys' fees, because they were the key players through which the two plans acted.  Janeiro cites no authority for treating the USPA and Chibaro as "losing parties" for purposes of attorneys' fees on a benefits claim that succeeded only against the plans.[11]  In any event, no matter whose and how plentiful were the assets available for an award of attorneys' fees, this factor would mean little.  "An inability to afford attorneys' fees may counsel

_____

[10] Janeiro argues that plan assets financed Chibaro's defense, and that Chibaro, as the primary owner of the remaining assets, would bear the brunt of a fee award to Janeiro.  On appeal, Chibaro says he bore (with his plan assets) the attorneys' fees and costs of defending this case.   If any payment was improper, an appropriate party may pursue the matter.

[11] The breach of fiduciary duty claim was asserted only against Chibaro and the USPA.   The claims for benefits, prejudgment interest, and attorneys' fees did not specify defendants, although the first claim did assert a right to sue "the Plans."   It is apparent from various pretrial filings that the parties understood these three claims to be against all the defendants, including Chibaro individually.   Moreover, the judgment for Janeiro did not specify which defendants were liable.   At trial, however, the district court said, in disposing of the breach of fiduciary duty claim, "I do not see how [Janeiro] can maintain any claim against . . . Chibaro individually.  I don't see how he can maintain claims against USPA in [its] capacity as a plan administrator.  Instead, his remaining claim is a claim for benefits which is properly asserted against the plans . . . ."   The court later reiterated that Janeiro was entitled to relief only against the two plans. Janeiro does not develop any contrary argument on appeal.

against an award, but the capacity to pay, by itself, does not justify an award."  Cottrill, 100 F.3d at 227 (citation omitted).

Turning to the third factor, the district court determined that the benefits award itself was large enough to deter similar misconduct, and that an award of attorneys' fees was unnecessary for that purpose.  Janeiro argues that denying fees sends the wrong message to the "ERISA community" and invites plan administrators to "play fast and loose" with plan terms and with departing participants' money.  The district court, which viewed the evidence in this case first-hand, disagreed, and we have no basis for rejecting its conclusion.  See id.

The fourth factor is "the benefit (if any) that the successful suit confers on plan participants or beneficiaries generally."  Id. at 225.  Nothing in the district court's consideration of this factor required a different result.

Fifth and finally, the district court stressed that "this [was] a close case using a de novo standard."  Indeed, the judge stated, it was one of the most difficult cases he had ever decided. Cf. id. at 227 ("The very fact that an experienced trial judge originally found in the defendants' favor argues for a finding that the defendants had a reasonable basis for [their position], even though this court ultimately ruled against them.").  The standard of review to apply to defendants' decision to revalue was not an

open-and-shut question, nor was the correctness of the decision itself.

The district court, in short, did not abuse its discretion in denying Janeiro attorneys' fees.

B.        Prejudgment Interest

Janeiro seeks prejudgment interest on the $195,036 he won in the district court, and on the $456,644 he was paid in the fall of 2002, to the extent that payment was also late.  The district court denied any award, saying that it "reach[ed] the same conclusion" as it reached with respect to attorneys' fees, for "much the same" reasons.  The court did single out one consideration -- the effect an award of interest would have on the plan -- but did not otherwise elaborate.

Although there is no specific statutory provision for prejudgment interest in most ERISA cases, such awards, like attorneys' fees, are "available, but not obligatory."  Id. at 223.  We review the denial of prejudgment interest in ERISA cases only for abuse of discretion.[12]  Id.

Janeiro was wrongfully deprived of the use of money for a substantial length of time, and prejudgment interest would make

---

[12] Janeiro has not offered any developed argument that this court should adopt (or has already adopted) a presumption in favor of prejudgment interest.  See Biggins v. Hazen Paper Co., 953 F.2d 1405, 1427 (1st Cir. 1992) (stating, where prejudgment interest was awarded, that "[w]e need not go [as far as adopting a presumption] at this time"), vacated on other grounds, 507 U.S. 604 (1993).

him whole as to that harm, see West Virginia v. United States, 479 U.S. 305, 310 n.2 (1987), which would "serve[] ERISA's remedial objectives," Cottrill, 100 F.3d at 224. But Congress's desire to protect employee benefits is not ERISA's only purpose. Varity Corp., 516 U.S. at 497. Further, prejudgment interest "is not granted 'according to a rigid theory of compensation for money withheld, but is given in response to considerations of fairness.'" Whitfield v. Lindemann, 853 F.2d 1298, 1306 (5th Cir. 1988) (quoting Blau v. Lehman, 368 U.S. 403, 414 (1962)); see also Blau, 368 U.S. at 414 (interest "is denied when its exaction would be inequitable" (internal quotation mark omitted) (quoting Bd. of Comm'rs v. United States, 308 U.S. 343, 352 (1939))).

Here, the district court was, first, concerned about how an award of interest would affect the plan. The benefits claim itself was quite substantial in light of the total plan assets. Cf. Goya Foods, Inc. v. Wallack Mgmt. Co., 290 F.3d 63, 80 (1st Cir. 2002) (district court free to "decide to leave well enough alone" where underlying monetary sanction for contempt was itself "a substantial amount of money"). The court also thought the ordinary attorneys' fees factors pertinent. These factors might not be automatically applicable in all prejudgment interest cases. But Janeiro does not argue that these factors were impermissible

considerations,[13] and, as explained above in the attorneys' fees discussion, we see nothing wrong with how the court assessed them in light of the facts of this case.  The district court did not abuse its discretion in denying an award of prejudgment interest.

IV.

Conclusion

The district court's analysis of this case was careful and fair.  Its judgment, awarding plaintiff $195,036 on the benefits claim and denying him an award of attorneys' fees and prejudgment interest, is affirmed.  The parties shall bear their own costs and attorneys' fees on appeal.

---

[13] Indeed, Janeiro even relies on the deterrence factor -- which, as already stated, the district court viewed as adequately served by the large benefits award.