# United States Court of Appeals
## For the First Circuit

Nos. 08-2561
     08-2563

GASTRONOMICAL WORKERS UNION LOCAL 610 & METROPOLITAN HOTEL
ASSOCIATION PENSION FUND ET AL.,

Plaintiffs, Appellants/Cross-Appellees,

v.

DORADO BEACH HOTEL CORPORATION ET AL.,

Defendants, Appellees/Cross-Appellants.

APPEALS FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF PUERTO RICO

[Hon. José Antonio Fusté, U.S. District Judge]

Before

Howard, Selya and Thompson, Circuit Judges.

Jeffrey S. Swyers, with whom Barry S. Slevin, Allison A.
Madan, and Slevin & Hart, P.C. were on brief, for plaintiffs.
     James C. Polkinghorn, with whom Alejandro Méndez Román, José
R. González-Noqueras, and Jiménez, Graffam & Lausell were on brief,
for defendant Dorado Beach Hotel Corporation.
     Manuel Duran-Rodríguez and Manuel Duran Law Office on brief
for defendant La Mallorquina, Inc.

August 11, 2010

**SELYA**, **Circuit Judge**. These appeals are distinctive in two respects. First, they require us to ponder a question of first impression under the Employee Retirement Income Security Act (ERISA), 29 U.S.C. §§ 1001-1481 (2000),[1] which concerns the operation of ERISA's minimum funding requirement. See id. § 1082. Second, the appeals provide us with an opportunity to discuss, for the first time, the Supreme Court's recent teachings in Hardt v. Reliance Standard Life Insurance Co., 130 S. Ct. 2149 (2010), which clarified the operation of ERISA section 502(g)(1), 29 U.S.C. § 1132(g)(1). The tale follows.

## I. BACKGROUND

The underlying action was brought by the Gastronomical Workers Union Local 610 & Metropolitan Hotel Association Pension Fund (the Fund), a multi-employer pension plan covered by ERISA, and the trustees of the Fund. The Fund, as an entity, was dismissed by the district court for lack of standing, and that ruling is not challenged on appeal. We therefore refer to the trustees as the plaintiffs.

The complaint named the eleven employers who composed the Metropolitan Hotel Association as defendants. Along with Local 610, these employers were parties to a collective bargaining

---

[1] ERISA was heavily amended by the Pension Protection Act of 2006, Pub. L. No. 109-280, 120 Stat. 780. We refer here to the prior version of the law, which governs the substantive issues in this case.

agreement (CBA), which had been renegotiated and renewed from time to time. A current iteration of the CBA remains in effect. It provides in pertinent part that the employers will make periodic contributions to the Fund. In the first instance, the CBA for any given year effectively dictates the amounts to be contributed by a particular employer.

Local 610 and the employers established the Fund in 1971, by means of a declaration of trust. Its primary purpose is to provide pensions for eligible employees.

The Fund operates on a May 31 fiscal year. ERISA mandates that covered pension plans, such as the Fund, must meet the statutory minimum funding standard in each fiscal year. See ERISA section 302, 29 U.S.C. § 1082. When a plan fails to satisfy the minimum funding requirement for a given year, the plan sponsor — the employer — must make additional contributions to bridge the gap. See id. § 1082(a)-(b). In a multi-employer plan, this responsibility is shared among participating employers. See id. § 1082(c)(11)(A).

The focal point of this case is the Fund's 2005 plan year. The CBA then in effect provided for employer contributions of $58 per eligible employee per month. In the spring of 2005, the Fund's actuary determined that these contributions would not be adequate to allow the Fund to satisfy ERISA's minimum funding standard. The actuary projected that an additional sum of $622,363

would be needed. ERISA allows employers a grace period of eight and one-half months after the end of a plan's fiscal year within which to cure an accumulated funding deficiency. See 29 U.S.C. § 1082(c)(10). With this in mind, the actuary calculated that the necessary sum could be raised by increased employer contributions of $100 per eligible employee per month.

The CBA recognized that the agreed contribution levels might have to be adjusted if and when an actuarial evaluation indicated a funding shortfall. In that event, the parties promised to "seek to reach an agreement as to an increase in the contributions stipulated [in the CBA]." Presumably with this language in mind, the trustees, by letter dated May 19, 2005, notified the employers of the projected deficiency for plan year 2005 and advised them that increased monthly contributions, as recommended by the actuary, would be required beginning June 1, 2005. The employers turned a deaf ear to this importuning, eschewing any increased contributions.

On March 14, 2006, the Fund filed Form 5500 with the Internal Revenue Service (IRS), reporting an accumulated funding deficiency of $643,748 for the 2005 plan year. The trustees notified the employers that they had reported a funding deficiency in this amount to the IRS.

The principal enforcement mechanism for the repair of minimum funding deficiencies is the imposition of excise tax

penalties.  See 26 U.S.C. §§ 412, 4971 (2000); see also D.J. Lee, M.D., Inc. v. Comm'r, 931 F.2d 418, 420 (6th Cir. 1991) ("The excise tax . . . was intended by Congress to enforce compliance with [the minimum funding] requirements.").  If a pension plan has a minimum funding deficiency that is not corrected by additional employer contributions within eight and one-half months of the end of the plan year, the employer becomes liable for a mandatory excise tax of five percent of the amount of the deficiency.  26 U.S.C. § 4971(a).  If the deficiency is not thereafter seasonably corrected, an additional tax, equal to one hundred percent of the funding deficiency, is imposed.  Id. § 4971(b), (c)(3).

On May 31, 2006, the Fund requested a waiver with respect to the accumulated funding deficiency for plan year 2005.  29 U.S.C. § 1083.  To date, the IRS has not acted on this application.

During calendar 2006, one employer, Dorado Beach Hotel Corp. (DBHC), withdrew from the Fund.  ERISA requires an employer who wishes to withdraw from a multi-employer plan to continue contributing toward its vested but unfunded liabilities, accrued as of the date of its withdrawal, until those liabilities are fully funded.  See id. §§ 1381, 1391.  The trustees, acting on actuarial advice, promulgated a schedule of DBHC's monthly withdrawal liability payments.  DBHC began complying with this payment schedule.

In February of 2007, the trustees advised DBHC that the Fund would not meet the minimum funding requirement for the 2006 plan year unless it received $1,900,000 in additional contributions within the cure period. DBHC agreed to make a lump-sum payment in that amount in exchange for a favorable variance in its scheduled withdrawal liability payments. DBHC and the Fund entered into a similar arrangement for the 2007 plan year; the former again advanced $1,900,000 to enable the latter to avoid a looming minimum funding deficiency for the 2007 plan year and again received a favorable variance in the (previously amended) schedule of withdrawal liability payments.

## II. TRAVEL OF THE CASE

On March 31, 2006, the trustees commenced an action against the employers in the United States District Court for the District of Puerto Rico. The trustees brought this action under 29 U.S.C. § 1132(a)(3), which supplies a cause of action in favor of an ERISA fiduciary "(A) to enjoin any act or practice which violates any provision of [ERISA] or the terms of the plan or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of [ERISA] or the terms of the plan . . . ." The scope of the action has narrowed over time; out of eleven employers originally named as defendants, only two, DBHC and La Mallorquina, Inc., remain in the case. Seven employers have settled, and two others have defaulted.

-6-

Pertinently, the trustees alleged that the employers failed to make sufficient payments to keep the Fund in compliance with ERISA's minimum funding requirement, ERISA section 302(a), 29 U.S.C. § 1082(a), for plan year 2005. They sought equitable relief, including an injunction, an order requiring the employers to contribute the additional monies needed to satisfy the minimum funding requirement for plan year 2005, liquidated damages, attorneys' fees, interest, and costs.

The employers moved to dismiss, asserting that (i) their liability for Fund contributions was limited to the schedule of contributions described in the CBA, and (ii) the trustees lacked standing to sue. The district court denied the motion. Gastronomical Workers Union v. Dorado Beach Hotel Corp. (GW I), 476 F. Supp. 2d 99, 106-07 (D.P.R. 2007). The part of the district court's ruling that resolved the issue of standing is not challenged on appeal.

In due course, the trustees moved for summary judgment, seeking judgment against each employer for its pro rata share of the accumulated funding deficiency for plan year 2005, along with liquidated damages, prejudgment interest, attorneys' fees, and costs under ERISA section 502(g)(2), 29 U.S.C. § 1132(g)(2). The employers opposed this motion and cross-moved for summary judgment in their favor.

The district court granted the trustees' motion to the extent that it sought enforcement of the minimum funding requirement for plan year 2005. Gastronomical Workers Union v. Dorado Beach Hotel Corp. (GW II), Civ. No. 06-1346, slip op. at 13 (D.P.R. Oct. 20, 2008). The court ruled that the employers were liable under section 302 for additional sums needed to cure the 2005 funding deficiency. Id. at 7-8. The court refused, however, to grant any ancillary relief. Id. at 13. At the same time, the court denied the cross-motion. Id. The court entered a judgment against each employer for a dollar amount representing that employer's pro rata share of the accumulated funding deficiency that had been reported at the end of the 2005 plan year.

Invoking Federal Rule of Civil Procedure 54(d) and ERISA section 502(g)(1), 29 U.S.C. § 1132(g)(1), the trustees filed a postjudgment motion for attorneys' fees, interest, and costs. The district court denied this motion without comment. Both sides appealed, and we consolidated the two appeals.

## III. ANALYSIS

The employers' appeal and the trustees' appeal focus on different aspects of the district court's orders. We address them sequentially.

### A. The Employers' Appeal.

We review de novo the district court's grant of summary judgment in favor of the trustees on their minimum funding

-8-

requirement claim.  See, e.g., Kouvchinov v. Parametric Tech. Corp., 537 F.3d 62, 66 (1st Cir. 2008).  We assay the facts and all reasonable inferences therefrom in the light most hospitable to the parties against whom summary judgment was granted (here, the employers).  Id.  If the record, so viewed, demonstrates both the absence of any genuine issues of material fact and the moving parties' entitlement to judgment as a matter of law, we will uphold the order.  See id.; see also Fed. R. Civ. P. 56(c).

Resolving the employers' appeal requires an understanding of the statutory framework.  Congress has mandated that ERISA plans must meet a minimum funding standard for each plan year.  29 U.S.C. § 1082(a)(1).  A plan satisfies this standard "if as of the end of such plan year the plan does not have an accumulated funding deficiency."  Id.  Leaving to one side the series of adjustments needed to reach that determination, an accumulated funding deficiency occurs when a plan's liabilities exceed its assets.  See id. § 1082(a)(2), (b).  When a pension plan has an accumulated funding deficiency at the end of the plan year, the participating employer(s) must make sufficient additional payments to erase the deficiency.  Otherwise, the employers face substantial excise tax liabilities.  See id. § 1082(c)(11)(A); see also UAW v. Keystone Consol. Indus., Inc., 793 F.2d 810, 813 (7th Cir. 1986).  A failure to make contributions required for this purpose also may be enforced by means of a civil action brought under 29 U.S.C.

§ 1132(a). See McMahon v. McDowell, 794 F.2d 100, 107 (3d Cir. 1986); see also H.R. Rep. No. 93-1280, at 27 (1974) (Conf. Rep.), reprinted in 1974 U.S.C.C.A.N. 5038, 5065 (explaining that "the responsible employer may be subject to civil action in the courts on failure to meet the minimum funding standards"). Employers have up to eight and one-half months beyond the end of a plan year within which to remedy an accumulated funding deficiency. 29 U.S.C. § 1082(c)(10).

In the case at hand, certain critical facts are not in dispute. First, the Fund's actuarial computations are unchallenged. Thus, we can take as true that the Fund had an accumulated funding deficiency of $643,748 at the end of the 2005 plan year and required additional employer contributions to offset this shortfall. Second, the allocation methodology with respect to that deficiency (that is, the division of the total funds needed among the participating employers) is not controverted on appeal. Thus, the amounts at issue are $249,314.89 (the amount of the judgment against DBHC) and $2,344.85 (the amount of the judgment against La Mallorquina). Finally, it is uncontradicted that no additional contributions to the Fund were made during the eight and one-half months next following the end of the 2005 plan year.

In their appeal, the employers argue that the district court erred because (i) the suit is not ripe; (ii) the CBA foreclosed the trustees from seeking increased employer

-10-

contributions; (iii) the accumulated funding deficiency was attributable to trustee mismanagement and, therefore, not properly chargeable against the employers; and (iv) the accumulated funding deficiency no longer exists. We confront these arguments in turn.

1.      **Ripeness**.      Under ERISA, the minimum funding requirement is enforced, in part, by the imposition of an excise tax to punish noncompliance.  See 26 U.S.C. § 4971.  The IRS, in its sole discretion, may waive strict compliance with the minimum funding requirement upon timely application.  29 U.S.C. § 1083; D.J. Lee, 931 F.2d at 421.

To obtain a waiver, the employer must demonstrate that it has experienced a "substantial business hardship," which impedes its ability to make the necessary contributions in a timely manner. 29 U.S.C. § 1083(a)-(b).  If the IRS grants the waiver, the employer is exempted from the excise tax, the plan's account is credited with the amount of the deficiency, and the employer becomes obligated to pay that amount, with interest, on an extended amortization schedule of up to fifteen years.  See id. § 1083; see also 26 U.S.C. §§ 412, 4971.  Because the IRS has not yet acted upon the waiver application filed in connection with the Fund's 2005 plan year, DBHC maintains that the trustees' suit is unripe.

It is common ground that federal courts may adjudicate only actual cases and controversies.  See U.S. Const. art. III; DaimlerChrysler Corp. v. Cuno, 547 U.S. 332, 340-41 (2006); Ernst

-11-

& Young v. Depositors Econ. Prot. Corp., 45 F.3d 530, 535 (1st Cir. 1995). An array of doctrinal safeguards ensures the integrity of this justicibility principle. Ripeness is one such doctrine — a doctrine that is rooted in both constitutional and prudential considerations. See Ernst & Young, 45 F.3d at 535.

Courts evaluate whether a case is ripe by assessing the fitness for adjudication of the issue presented and determining whether a refusal to adjudicate that issue will work a hardship on the party who seeks a remedy. See R.I. Ass'n of Realtors, Inc. v. Whitehouse, 199 F.3d 26, 33 (1st Cir. 1999). Fitness involves questions about whether the necessary factual predicate is sufficiently matured to allow a court to resolve the issue presented. See id. Hardship "typically turns upon whether the challenged action creates a direct and immediate dilemma for the parties." Id. (quoting Ernst & Young, 45 F.3d at 535).

This case is ripe for adjudication. All of the events giving the existence of the accumulated funding deficiency for plan year 2005 and the employers' responsibility for it are matters of historical fact. Moreover, it is clear that, if the trustees' version of those events is accurate, the Fund has suffered an injury. A refusal to adjudicate the parties' conflicting claims would serve only to delay the vindication of that injury. Consequently, there is a matured dispute between the parties, ripe for adjudication.

DBHC's counter-argument, though couched as a claim of lack of ripeness, is really something quite different. Fairly viewed, that claim does not suggest that the trustees have alleged a speculative injury, the existence of which depends upon future events that may or may not occur. Rather, the claim is that a future event may change the type of remedy available to redress an existing injury. Consequently, it is the future event, not the trustees' injury, that is speculative. Viewed in this light, DBHC's argument is not a ripeness argument at all. See, e.g., McInnis-Misenor v. Me. Med. Ctr., 319 F.3d 63, 69 (1st Cir. 2003) (citing 13A Charles A. Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice & Procedure § 3531.12, at 50 (2d ed. 1984)); DeMauro v. DeMauro, 115 F.3d 94, 97 (1st Cir. 1997).

2. **The CBA Defense**. Belaboring the obvious, the employers next declaim that, under ERISA, the duty to contribute to a pension plan is contractual in nature. See 29 U.S.C. § 1145; see also Laborers Health & Welfare Trust Fund v. Advanced Lightweight Concrete Co., 484 U.S. 539, 546 (1988). The CBA in effect here contains an employer-specific, dollar-specific schedule of such contributions. Because the employers paid these contributions as required under the CBA, this argument runs, they have no further payment responsibilities notwithstanding the occurrence of an accumulated funding deficiency.

-13-

We agree with the employers that pension contribution obligations are contractual in nature. Int'l Bhd. of Painters & Allied Trades Union v. George A. Kracher, Inc., 856 F.2d 1546, 1549 (D.C. Cir. 1988). But this tenet does not exist in a vacuum. Whatever a private contract may provide, ERISA continues to govern employers' funding obligation with respect to covered pension plans. See Advanced Lightweight Concrete, 484 U.S. at 546-47. The statutory mandates operate in tandem with contractually imposed duties. See Hughes Aircraft Co. v. Jacobson, 525 U.S. 432, 442 (1999); Keystone Consol. Indus., 793 F.2d at 813. When a plan fails to meet the statutorily imposed minimum funding requirement for a given plan year, the employer must satisfy that requirement by making further payments, regardless of the terms of the CBA. See 29 U.S.C. § 1082(a)(1). The statutory obligation is independent of whatever arrangements private agreements may contemplate. See Hughes Aircraft, 525 U.S. at 442; cf. Esden v. Bank of Bos., 229 F.3d 154, 173 (2d Cir. 2000) (stating that "[t]he Plan cannot contract around [ERISA]").

Were the rule otherwise, parties could elude ERISA's commands by the simple expedient of sharp bargaining. This result, intolerable in itself, also would frustrate one of ERISA's primary goals: to ensure that covered pension plans provide employees promised retirement benefits. See Nachman Corp. v. Pension Ben. Guar. Corp., 446 U.S. 359, 375 (1980); In re Merrimac Paper Co.,

-14-

420 F.3d 53, 64 (1st Cir. 2005). We hold, therefore, that an employer cannot shield itself from ERISA liability under section 302 simply by performing its obligations under a collective bargaining agreement.

Here, the contributions dictated by the CBA proved insufficient, in the 2005 plan year, to allow the Fund to satisfy ERISA's minimum funding requirement. Accordingly, additional contributions sufficient to eliminate that deficiency were required. Those contributions were the employers' collective responsibility, over and above the payments described in the CBA.

In an effort to dull the edge of this reasoning, the employers advert to the declaration of trust that established the Fund. That document not only ties an employer's payment obligations to those limned in the CBA but also makes clear that the trustees lack the power to enlarge those obligations. In addition, the employers cite case law holding that, under ERISA section 515, 29 U.S.C. § 1145, suits to enforce a CBA must be regarded as contractual in nature. See, e.g., Carpenters Fringe Benefit Funds v. McKenzie Eng'g, 217 F.3d 578, 582 (8th Cir. 2000); Mass. Laborers' Health & Welfare Fund v. Starrett Paving Corp., 845 F.2d 23, 25 (1st Cir. 1988).

These arguments miss the mark. This suit is not an action to collect under, or enforce, the CBA. Rather, it is an action to garner the amounts needed to satisfy ERISA's minimum

funding requirement.  The trustees have the right to pursue such an action.  See 29 U.S.C. § 1132(a)(3); see also Hughes Aircraft, 525 U.S. at 442.

The employers also try a variation on this theme.  They note that pension benefits are "terms and conditions" of employment and, as such, are mandatory subjects of collective bargaining. Allied Chem. & Alkali Workers v. Pittsburgh Plate Glass Co., 404 U.S. 157, 159, 163-64 (1971).  Parties must continue to perform under the extant terms of the CBA while they follow the bargaining procedure to seek a modification.  See 29 U.S.C. § 158(d); see also Allied Chem., 404 U.S. at 185; Prof'l Admin'rs Ltd. v. Kopper-Glo Fuel, Inc., 819 F.2d 639, 643 (6th Cir. 1987).  Against this backdrop, the employers contend that the trustees' intervention resulted in a mid-term modification of a mandatory subject of collective bargaining, and, thus, contravened basic principles of labor law.

The employers' contention misunderstands the nature of the trustees' action.  The trustees did not seek a court-ordered increase in the monthly contribution rate specified in the CBA. Instead, they sought an order compelling the employers to ameliorate the accumulated funding deficiency.  In granting relief,

the district court neither modified the CBA nor intruded into the collective bargaining process.[2]

        **3. <u>Trustee Mismanagement</u>**. The employers assert that the trustees mismanaged the Fund's investments and thereby caused the accumulated funding deficiency. On that premise, they asseverate that they cannot be held liable for the deficiency. Alternatively, they say that an issue of material fact exists concerning the origins of the deficiency.

        There is a fundamental problem with this asseveration: considerations such as managerial proficiency are immaterial in a minimum funding case. ERISA sets forth a specific set of computations that must be made to determine whether a funding deficiency exists. <u>See</u> 29 U.S.C. § 1082(b). Those computations do not include investigations into the propriety of how the fund is managed.

        Of course, the trustees of a pension plan can be sued for breach of their fiduciary duties. <u>See</u>, <u>e.g.</u>, <u>Livick</u> v. <u>Gillette Co.</u>, 524 F.3d 24, 28-29 (1st Cir. 2008). That type of suit may inquire into the propriety of how a fund is being managed. <u>See</u>, <u>e.g.</u>, <u>Bunch</u> v. <u>W.R. Grace & Co.</u>, 555 F.3d 1, 7 (1st Cir. 2009). But such a suit cannot be confused with a suit that seeks to

---

[2] The trustees' letter, though inartfully phrased, does not work a modification of the CBA. The letter has legal force only as a notice to the employers of a looming problem. That the notice was coupled with a suggestion about how the problem might be remedied does not change its legal effect.

enforce section 302's minimum funding requirement. Cf. Sova Outerwear Corp. v. Trs. of Amalg. Cotton Garment & Allied Indus. Fund, 578 F. Supp. 1126, 1127 (S.D.N.Y. 1984) (stating that ERISA separates breach of fiduciary duty claims from withdrawal liability claims). In short, allegations of trustee mismanagement should be raised in a suit for breach of fiduciary duty. They play no role in the decisional calculus in this suit over a funding deficiency.

**4. The Vanishing Deficiency**. Finally, the employers claim that, when the district court entered judgment, the accumulated funding deficiency no longer existed. The district court avoided this issue, concluding that developments after the end of the 2005 plan year were "irrelevant" to the continued existence of the deficiency. GW II, slip op. at 11. We think that this conclusion overlooks the workings of the actuarial computations required by ERISA.

Under ERISA, a pension plan's books are kept on a rolling basis, using the accrual method of accounting. Accordingly, if a funding deficiency exists at the end of a particular plan year, that deficiency, if uncorrected, carries over into the next year's accounting. See In re Sunarhauserman, Inc., 126 F.3d 811, 820 (6th Cir. 1997); see also IRS Form 5500, Schedule B; cf. Cress v. Wilson, No. 06-2717, 2008 WL 5397580, at *5 (S.D.N.Y. Dec. 29, 2008) (stating that certain current-year plan liability payments must, at minimum, meet prior-year funding requirements). That is

why the pertinent statutory text speaks in terms of an "accumulated" funding deficiency. See, e.g., 29 U.S.C. § 1082(a)(2).

Here, the district court entered the judgment on October 20, 2008. If at that time an accumulated funding deficiency no longer existed, the dollar-specific judgment entered by the district court would, absent some explanation, allow the Fund, in effect, to collect the same deficiency twice. ERISA does not countenance this kind of double-dipping. See Ronald J. Cooke, ERISA Practice and Procedure § 5.19, at 5-90 (2d ed. 2010); cf. 26 U.S.C. § 4971(a)-(b) (providing initial tax penalty for an accumulated funding deficiency, to be followed by additional tax penalties only if, and to the extent that, the deficiency remains unabated).

In addition, ERISA section 502(a)(3) provides for equitable relief only. 29 U.S.C. § 1132(a)(3). The relief awarded here — a dollar-specific judgment — may well have exceeded the scope of the statute. Interpreting this very provision, the Supreme Court has stated that "[a]lmost invariably . . . suits seeking (whether by judgment, injunction, or declaration) to compel the defendant to pay a sum of money to the plaintiff are suits for 'money damages,' as that phrase has traditionally been applied, since they seek no more than compensation for loss resulting from the defendant's breach of legal duty. And '[m]oney damages are, of

-19-

course, the classic form of <u>legal</u> relief.'"[3]  <u>Great-W. Life &</u>
<u>Annuity Ins. Co.</u> v. <u>Knudson</u>, 534 U.S. 204, 210 (2002) (quoting
<u>Mertens</u> v. <u>Hewitt Assocs.</u>, 508 U.S. 248, 256 (1993)) (internal
citations omitted).

Seen in this light, the judgment cannot stand.  The
record suggests that, by the time the court entered the judgment,
the deficiency may have vanished.  The record contains no
explanation of the vanishing deficiency sufficient to salvage the
judgment.

Indeed, the only explanation suggested seems to favor the
employers' position.  After DBHC announced its intention to
withdraw from the multi-employer plan, it entered into a schedule
of withdrawal liability payments on October 24, 2006.
Subsequently, the Fund and DBHC twice amended that schedule.  Each
of these nearly identical novations resulted in a multi-million-
dollar lump-sum payment to the Fund, one in 2007 and the other in
2008.  The ostensible purpose of the novations was to enable the
Fund to avoid accumulated funding deficiencies for the 2006 and
2007 plan years.

There are other telltales.  While the agreements are
unclear (and the record does not illuminate) as to whether the

_____

[3] We merely raise this question (which was not addressed by
the parties), leaving it to the district court, on remand, to
consider the type of relief (if any) available under ERISA section
502(a)(3).

-20-

payments affected any aspect of the preexisting 2005 plan year deficiency, language in the original withdrawal liability agreements links the calculation of withdrawal liability to unfunded vested benefits as of May 31, 2005 (the closing date of the 2005 plan year). Furthermore, IRS Form 5500, filed by the Fund for plan year 2006, indicates the absence <u>at</u> <u>that</u> <u>time</u> of any current deficiency.

The trustees downplay the import of these documents. Their first line of defense is that contributions to satisfy a funding deficiency are distinct from withdrawal liability payments. This postulate does not get them very far: an accumulated funding deficiency is cured through an infusion of funds into the plan, regardless of the obligation under which they are contributed. <u>See</u> 29 U.S.C. § 1082(b)(3)(A), (b)(7)(A); <u>see</u> <u>also</u> Cooke, <u>supra</u>, § 5.2, at 5-12 to 5-13. Withdrawal liability payments are, therefore, available to cure an accumulated funding deficiency. 29 U.S.C. § 1082(b)(7)(A).

Relatedly, the trustees say that the withdrawal liability payments in this case were earmarked for the 2006 and 2007 plan years and, thus, had no effect on the funding deficiency for the 2005 plan year. Given the rolling nature of ERISA accounting, this seems counter-intuitive; but in any event, the record is tenebrous as to how the additional payments were applied. Moreover, the cogency of the documentary evidence depends in large part on

-21-

inference and interpretation. To complicate matters, the district court did not inquire into the subject.

This is a mystery, wrapped in a riddle, tucked inside an enigma. The only thing that we can say with assurance is that the employers have raised genuine issues of material fact about the continued existence of the funding deficiency and about the appropriateness of the remedy — issues that demand further inquiry. Cf. Smart v. Gillette Co. Long-Term Disab. Plan, 70 F.3d 173, 179 (1st Cir. 1995) (stating that clarification of vague contract terms may require the taking of evidence). For example, it is possible that DBHC's lump-sum withdrawal liability payments were in fact used to offset minimum funding deficiencies for 2005 and later plan years. This is a matter for the district court, and we take no view of the ultimate resolution of that issue. Accordingly, the judgment must be vacated.

## B. **The Trustees' Appeal**.

In the court below, the trustees twice sought attorneys' fees.[4] As part of its adjudication of the trustees' motion for summary judgment, the district court denied their request for an award pursuant to ERISA section 502(g)(2), 29 U.S.C. § 1132(g)(2). The trustees subsequently made a postjudgment motion seeking attorneys' fees pursuant to ERISA section 502(g)(1), 29 U.S.C.

---

[4] We use "attorneys' fees" as a shorthand for a variety of ancillary remedies, including liquidated damages, prejudgment and postjudgment interest, and costs.

§ 1132(g)(1). The district court summarily denied that motion. On appeal, the trustees challenge both orders.

We review the two orders under different standards. Where section 502(g)(2) applies, a fee award is mandatory. See 29 U.S.C. § 1132(g)(2); Foltice v. Guardsman Prods., Inc., 98 F.3d 933, 936 (6th Cir. 1996). Thus, we review an order denying remedies under section 502(g)(2) de novo. See, e.g., Pendleton v. QuickTrip Corp., 567 F.3d 988, 994 (8th Cir. 2009); Graham v. Balcor Co., 146 F.3d 1052, 1054 (9th Cir. 1998). Fee awards under section 502(g)(1) are discretionary. See Cook v. Liberty Life Assur. Co., 334 F.3d 122, 123 (1st Cir. 2003) (per curiam); Peterson v. Cont'l Cas. Co., 282 F.3d 112, 122 (2d Cir. 2002). We therefore review the disposition of a motion seeking remediation under section 502(g)(1) for abuse of discretion. Janeiro v. Urol. Surgery Prof'l Ass'n, 457 F.3d 130, 143 (1st Cir. 2006).

1. **Section 502(g)(2)**. The challenge to the denial of remedies under section 502(g)(2) is readily dispatched. That section mandates the award of certain remedies, such as attorneys' fees, in a successful enforcement action brought pursuant to ERISA section 515, 29 U.S.C. § 1145. Writ large, section 515 requires an employer to comply with its contractual commitments to make periodic contributions to an ERISA plan. Here, however, the trustees' action was not prosecuted under section 515 but, rather,

under section 302.  As such, section 502(g)(2) is inapposite, and the district court did not err in denying remediation thereunder.

**2.  Section 502(g)(1)**.  Section 501(g)(1) is a horse of a different hue.  That section allows the district court, in its discretion, to award attorneys' fees in an ERISA action, not within the purview of section 502(g)(2), brought by a plan participant, beneficiary, or fiduciary.  The Supreme Court recently has clarified the proper mode of analysis with respect to this fee-shifting provision.  See Hardt, 130 S. Ct. at 2158.

The Hardt Court explained that eligibility for remediation under section 502(g)(1) does not require that the fee-seeker be a prevailing party.  Id. at 2157.  The Justices did not necessarily prohibit consideration of the five factors delineated in Cottrill v. Sparrow, Johnson & Ursillo, Inc., 100 F.3d 220, 225 (1st Cir. 1996).  See Hardt, 130 S. Ct. at 2158 n.8.  The Court nevertheless made clear that these factors could not be applied without modification, and that the focal point of the inquiry should be whether a claimant shows "some degree of success on the merits." Id. at 2158. Achieving this benchmark requires something more than a "purely procedural victory."  Id.  The statutory standard is satisfied as long as the merits outcome produces some meaningful benefit for the fee-seeker.  Id.

The district court did not have the benefit of Hardt and, thus, did not engage in the requisite analysis.  Consequently, we

-24-

vacate the order denying relief under section 502(g)(1). If this motion is renewed following the proceedings on record, the district court should reconsider it in light of Hardt; determine whether the trustees have achieved some degree of success on the merits; and decide whether to award attorneys' fees, costs, and/or other remedies encompassed within section 502(g)(1).

## IV. CONCLUSION

For the reasons elucidated above, we vacate both the dollar-certain judgment and the order denying relief under ERISA section 502(g)(1). We affirm the order denying relief under ERISA section 502(g)(2). We remand the case to the district court. On remand, the district court should conduct such further proceedings, consistent with this opinion, as it deems desirable to develop the record in the necessary respects. If the court determines that the trustees are entitled to prevail, it shall fashion whatever equitable relief may be appropriate.

Finally, we pause to add an exhortation. We urge the parties to give serious consideration to settling their differences. Litigation is expensive, and the sums that doubtless will be expended in fighting this case to the bitter end can better be used to secure the pension benefits of the employees enrolled in the Fund.

**Affirmed in part; vacated in part; and remanded. All parties shall bear their own costs in connection with these appeals**.