# United States Court of Appeals
## For the First Circuit

No. 09-2532

JULIO DEL TORO PACHECO,

Plaintiff, Appellant,

v.

MIGUEL A. PEREIRA, Secretary of Correction and Rehabilitation
Administration; ROBERTO IZQUIERDO-OCASIO,
Director of Special Arrest Unit,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Justo Arenas, U.S. Magistrate Judge]

Before

Lynch, Chief Judge,
Lipez, Circuit Judge,
and Woodcock,[*] District Judge.

Israel Roldán González on brief for appellant.
Irene S. Soroeta-Kodesh, Solicitor General, Leticia Casalduc-
Rabell, Deputy Solicitor General, Zaira Z. Girón-Anadón, Deputy
Solicitor General, and Susana I. Peñagarícano-Brown, Assistant
Solitor General, on brief for appellees.

January 31, 2011

_____

[*]   Of the District of Maine, sitting by designation.

**LIPEZ, <u>Circuit Judge</u>**.  In this political discrimination case, Julio Del Toro Pacheco (Del Toro) alleges that he was fired from his job at the Puerto Rico Department of Correction and Rehabilitation Administration (DCR) because his superiors, Roberto Izquierdo-Ocasio (Izquierdo) and Miguel A. Pereira, disagreed with his political beliefs.  The district court granted summary judgment for the defendants on the ground that Del Toro had not established a prima facie case of political discrimination because he failed to show that the defendants knew of Del Toro's political affiliation.  The court also held that, assuming Del Toro was able to establish a prima facie case, he failed to show that his political affiliation was a substantial or motivating factor in the termination.  Del Toro now appeals.  We affirm.[1]

## I.

We examine the record in the light most favorable to the appellant.  <u>Statchen</u> v. <u>Palmer</u>, 623 F.3d 15, 16 (1st Cir. 2010).[2]  Del Toro began working as a corrections officer for the DCR in December 1993.  In 1996, he became a member of the police escort for the then-governor of Puerto Rico, Pedro Rosselló, who, like Del Toro, belonged to the New Progressive Party (NPP).  A few years

---

[1] The parties consented to the conduct of all proceedings in the case by a magistrate judge, whose decision we therefore review directly.  <u>See</u> 28 U.S.C. § 636(c)(3); Fed. R. Civ. P. 73(c).

[2] Del Toro makes a number of assertions in his appellate brief unsupported by any evidence in the record.  We do not consider them.

-2-

later, Del Toro joined the Special Arrest Unit (SAU) of the DCR where, beginning in 2000, he was supervised by Izquierdo.

Del Toro and Izquierdo had been acquainted since 1996. When Izquierdo became Director of the SAU, he gave Del Toro poor recommendations. Del Toro told Izquierdo he was annoyed by this, to which Izquierdo responded, "You are going to be one of us, of the 'reds,' you are going to be a [Popular Democratic Party (PDP)] member." The evaluations began to improve, and Del Toro never filed an administrative complaint against Izquierdo.

According to Del Toro, Izquierdo gave better work to the SAU employees who were members of the PDP than to those who were members of the NPP. He also favored the PDP members with regard to vacation and holidays. Having been a supporter of the NPP since 1996, Del Toro felt he was a target of Izquierdo's differential treatment.

On March 27, 2006, at about 4:00 p.m., a 19-year-old woman filed a report with the Puerto Rico Police alleging that, at about noon that day, Del Toro had raped her at gunpoint.[3] At about 7:50 p.m., Del Toro was notified of the complaint and, about ten

---

[3] The defendants submitted the police report, which included a statement from the victim, in support of their motion for summary judgment. Del Toro objected to the report on the ground that it was unauthenticated. See Fed. R. Civ. P. 56(c)(2); Fed. R. Evid. 901(a). In the order granting summary judgment, the district court determined that several other exhibits were properly authenticated, but did not address the admissibility of Exhibit 3, the police report. The order cites the police report, and thus the court appears to have considered it. Nonetheless, Del Toro does not argue here that the court erred in doing so.

-3-

minutes later, he called Izquierdo to inform him of the same. After speaking with Del Toro, Izquierdo called the police to verify what Del Toro had told him.

The next day, Izquierdo met with the investigating officer, who related the details provided by the victim. The victim had met Del Toro through her husband a few years earlier. Del Toro came to her house at about noon, saying he had brought some car keys for her husband. When he arrived, the victim was in an outdoor bathroom. Del Toro entered the bathroom, brandished a firearm, and forced her to have intercourse with him.

After meeting with the officer, Izquierdo met with Del Toro, who said the victim had made up the story to get revenge after Del Toro had ended their consensual affair. Izquierdo then met with a sergeant in the Sexual Crimes Unit, who told him that she had interviewed the parties and decided to relieve Del Toro of both his regulation weapon -- the gun he was issued for use as a corrections officer -- and his personal gun, which he used for target shooting. The sergeant also told Izquierdo that she had attempted to ask Del Toro questions but he refused to answer without his attorney present.

On March 29, Izquierdo drafted a report describing what he had been told, and stating that charges would be filed by the prosecutor's office the following week. Izquierdo's report was

later delivered to his supervisor, Pereira, the Secretary of the DCR.

In response to the report, the DCR initiated an internal investigation of the alleged rape. In June, an investigating officer interviewed a policewoman, who stated that the prosecutor was waiting to receive a laboratory report before filing formal charges. The policewoman stated, however, that it was her understanding that the evidence they had was "clear and conclusive." She also reported that the victim had identified Del Toro's service weapon as the gun he had used during the rape.

A DCR officer also interviewed the victim, who reiterated her version of the incident and confirmed that the gun with which Del Toro had threatened her was his service weapon. The victim said that she feared for her life, as well as the lives of her husband and her child. Her husband, who was also interviewed during the internal DCR investigation, told a compatible story and, like the victim, said he feared for his life and for those of his wife and child.

According to Del Toro, Izquierdo's harassment escalated following the March 2006 incident. Izquierdo made comments to Del Toro such as, "If you were a member of the [PDP] maybe this [the administrative investigation] would not be happening to you." Izquierdo told Del Toro that his dismissal letter was already signed but that Izquierdo could prevent its delivery if Del Toro publicly affiliated with the PDP, and that not even former governor

Rosselló could save him. Izquierdo also said, "We have the perfect excuse to dismiss you and you won't be able to sue us again."[4] According to Del Toro, Izquierdo harassed him every day.

On September 7, 2006, Pereira sent a letter to Del Toro outlining the results of the internal investigation. Pereira stated that, regardless of the outcome of the criminal prosecution, he had decided to dismiss Del Toro for violating a number of laws and regulations applicable to corrections officers.[5] The letter explained that Del Toro could request an informal administrative hearing within fifteen days, or else the dismissal would be final.

---

[4] Izquierdo was apparently referring to a lawsuit Del Toro filed in 2001 alleging that certain DCR officials had discriminated against him on the basis of his political affiliation. According to Del Toro, the case was dismissed because there was "not enough" discrimination to establish a legally cognizable injury.

[5] Pereira cited the following provisions: Act No. 184, which requires public employees not to "[s]how a conduct which is inappropriate or harmful to the go[o]d name of the agency or the Government of the Commonwealth of Puerto Rico," or "[b]e guilty of prevarication, bribery, or immoral conduct," P.R. Laws Ann. tit. 3 § 1462e(8)(e) & (f); the Regulation for the Personnel of the Administration of Correction, which requires DCR personnel to "[o]bserve correct, courteous and respectful conduct standards in their relations with their supervisors, subordinates, co-workers and citizens," Art. 8, §§ 8.1 & 8.3, and provides that failure to do so may result in disciplinary action; the Regulation of Corrections Officers of the Administration of Correction, which requires the conduct of corrections officers to be "adequate and in accordance with the guidelines applicable to the Administration of Correction," Art. XII, § B; and the Manual for the Application of Corrective and Disciplinary Measures to the Employees of the Administration of Corrections, which gives Pereira the authority to terminate employees who do not conform to the required standard of conduct, including those who commit "any crime for which charges are filed or [for which the employee is jailed], which constitutes a danger to the security or which affects its public funds."

-6-

Del Toro requested the hearing and appeared before an examining officer in January 2007. His attorney accompanied him but only presented arguments, not evidence. In order to preserve his Fifth Amendment privilege against self-incrimination, Del Toro did not say anything. On January 24, Pereira wrote a second letter to Del Toro, reiterating the regulations that Del Toro had violated and dismissing him from the DCR. In that letter, Pereira admonished Del Toro that his conduct was "highly reproachable" and had violated the victim's "dignity and physical integrity." As before, the letter explained the appeal process and, once again, Del Toro appealed.

Criminal charges were brought against Del Toro in March 2007. Del Toro was accused of violating articles 142(c) and 289 of the Puerto Rico Penal Code, as well as article 5.15 of the Weapons Law. Article 5.15 relates to firing or pointing weapons, while articles 142(c) and 289 deal with sexual assault and threatening a witness. See P.R. Laws Ann. tit. 25, § 458n; tit. 33, §§ 4770, 4917. Following a preliminary hearing on November 6, 2007, the court dismissed the charges because of its finding that there was no probable cause to support them.

Del Toro's administrative appeal proceeded. In March 2009, the Investigation, Processing and Appeals Committee (CIPA) of Puerto Rico reviewed the case and issued its decision affirming the dismissal. In addition to setting forth CIPA's findings of fact,

-7-

the decision concluded that Del Toro had violated the regulations that Pereira had cited. Despite noting that the criminal charges had been dropped, CIPA concluded that Del Toro had in fact committed a sexual assault, saying that his conduct "not only dishonored the good name of the [DCR] but has vilified the dignity of men and women equally." CIPA was particularly incensed at Del Toro's abuse of his friends' trust, and stated that "[t]here is no space in the [DCR] nor in any agency with the important purpose of ensuring the safety of the general public[] for a depraved, immoral individual lacking values."

On January 30, 2008, Del Toro filed a complaint against Izquierdo and Pereira in their official and individual capacities, claiming that they had violated his First, Fifth, and Fourteenth Amendment rights. The complaint also included political discrimination claims under Puerto Rico law, and sought both damages and an injunction to reinstate Del Toro at the DCR and prevent further political discrimination against him.

After some preliminary skirmishing, the defendants moved for summary judgment, arguing that Del Toro failed to establish a prima facie case of political discrimination, that due process was afforded, that the court should not exercise supplemental jurisdiction over the Puerto Rico claims, and that the individual capacity defendants were entitled to qualified immunity. The district court held that the pre-termination process Del Toro

received satisfied his constitutional rights. The court further held that he failed to establish a prima facie case of political discrimination because the evidence did not show that either defendant knew that he was a member of the NPP. Alternatively, even if he did establish his prima facie case, he failed to show that he was terminated due to his affiliation rather than as a result of the administrative investigation into the allegations of rape. The court also declined to exercise supplemental jurisdiction over the remaining Puerto Rico claims and dismissed them without prejudice. Del Toro then appealed.

**II.**

We review the summary judgment order de novo. Penn-Am. Ins. Co. v. Lavigne, 617 F.3d 82, 84 (1st Cir. 2010). We assess the record and draw all reasonable inferences from it in the light most favorable to Del Toro, the non-moving party. Gastronomical Workers Union Local 610 & Metro. Hotel Ass'n Pension Fund v. Dorado Beach Hotel Corp., 617 F.3d 54, 60 (1st Cir. 2010). We ignore any "conclusory allegations, improbable inferences, and unsupported speculation." Sutliffe v. Epping Sch. Dist., 584 F.3d 314, 325 (1st Cir. 2009). The grant of summary judgment will be affirmed where there are no genuine disputes of material fact and the moving party is entitled to judgment as a matter of law. Gastronomical Workers Union Local 610, 617 F.3d at 60; see also Fed. R. Civ. P.

56(a)[6]. We need not adopt the district court's reasoning, but may affirm on any ground made apparent in the record. Roman v. Potter, 604 F.3d 34, 38 (1st Cir. 2010).

## III.

"The First Amendment protects the right of public career employees . . . to engage in political activities without fear of adverse employment actions." Rodríguez-Marín v. Rivera-González, 438 F.3d 72, 79-80 (1st Cir. 2006). In pursuing such a First Amendment claim, the plaintiff's prima facie case is established by introducing evidence that "(1) the plaintiff and the defendant [have] opposing political affiliations; (2) the defendant has knowledge of the plaintiff's affiliation; (3) a challenged employment action occurred; and (4) political affiliation was a substantial or motivating factor behind it." Welch v. Ciampa, 542 F.3d 927, 938-39 (1st Cir. 2008) (alterations omitted) (quoting Martinez-Vélez v. Rey-Hernández, 506 F.3d 32, 39 (1st Cir. 2007)). The defendants do not contest that they are members of the PDP and Del Toro is a member of the NPP, nor do they contest that Del Toro was fired. Thus, Del Toro has established the first and third elements of his prima facie case.

---

[6] In its order granting summary judgment, the district court correctly cited Federal Rule of Civil Procedure 56(c). Rule 56 was amended, effective December 1, 2010. The standard for granting summary judgment now appears in subsection (a), but remains substantively the same. See Fed. R. Civ. P. 56 advisory committee's note; see also Godin v. Schencks, No. 09-2324, 2010 WL 5175180, at *9 n.19 (1st Cir. Dec. 22, 2010).

-10-

With respect to the second prong, we agree with the district court that Del Toro has not shown that Pereira knew of Del Toro's affiliation with the NPP. Del Toro admitted that he did not know Pereira, that he had never spoken -- let alone discussed politics -- with Pereira, and that the only reason he named Pereira in the complaint was because he was the Secretary of the DCR.[7] Thus, Del Toro did not make out a prima facie case with respect to Pereira.[8]

Izquierdo's knowledge of Del Toro's affiliation, on the other hand, presents a genuine dispute of material fact. Izquierdo maintains that he did not know that Del Toro was an NPP member until the complaint was filed -- i.e., almost two years after Izquierdo alerted Pereira to the pending criminal investigation of Del Toro. Del Toro, for his part, has submitted evidence that Izquierdo knew years before, when he gave Del Toro bad evaluations and told him, "[Y]ou are going to be one of us, of the 'reds,' you are going to be a [PDP] member." Del Toro also stated, under oath,

---

[7] In an attempt to show that Pereira knew of his political affiliation, Del Toro relies heavily on his sworn statement that Izquierdo said, "Pereira knows that you filed a claim against us and that you are a member of the NPP." Because Izquierdo's remark was an out-of-court statement offered to prove the truth of the matter asserted, it is hearsay. See Fed. R. Evid. 801(c), 802. Such hearsay would be inadmissible at trial, and thus cannot be considered on a motion for summary judgment. See Saccucci Auto Grp., Inc. v. Am. Honda Motor Co., 617 F.3d 14, 25 (1st Cir. 2010).

[8] Although Del Toro was an escort for a former NPP governor, a position that would suggest to others that he was an NPP supporter, he does not allege that Pereira knew he held that position.

-11-

that Izquierdo made a number of comments to him beginning in late March 2006 deriding his NPP affiliation and urging him to switch to the PDP in order to keep his job.  This evidence directly contradicts Izquierdo's sworn statement, and thus creates a genuine dispute of material fact as to whether Izquierdo knew about Del Toro's political affiliation before the termination.

One prong of the prima facie case remains, however, and Del Toro has not satisfied it here.  There is no indication in the record that Del Toro's NPP affiliation was a substantial or motivating factor behind his termination.  Del Toro had been working at the DCR, under Izquierdo's supervision, for years without any adverse employment action taken against him.  In fact, the great majority of the specific allegations of harassment took place after Del Toro self-reported the rape accusation to Izquierdo.  Izquierdo promptly investigated the matter and reported it to Pereira.  Del Toro does not suggest that this investigation or reporting was in any way inappropriate or beyond the scope of Izquierdo's duties and, given the nature of the alleged crime, failure to report it to Pereira might well have been dereliction of duty.

Moreover, the record reflects that it was Pereira who made the decision to fire Del Toro, not Izquierdo.  Izquierdo stated that his only participation in the termination, other than reporting the criminal investigation to Pereira, was to serve as a

witness to the delivery of Pereira's termination letter. As we have explained, there is no admissible evidence in the record that Pereira knew of Del Toro's political affiliation. Therefore, the termination decision by Pereira could not have been motivated by that affiliation. Cf. Vazquez v. Lopez-Rosario, 134 F.3d 28, 36 (1st Cir. 1998) (the fact of plaintiff's political differences with one board member does not establish that the remainder of the board "acquiesced in a plan to eliminate his position in retaliation for those differences"). The termination was not illegal unless there was "'a causal connection . . . linking [it] to plaintiff's politics.'" LaRou v. Ridlon, 98 F.3d 659, 662 (1st Cir. 1996) (quoting Correa-Martinez v. Arrillaga-Belendez, 903 F.2d 49, 58 (1st Cir. 1990)). Del Toro cannot establish such a connection where he "'merely juxtapos[es] a protected characteristic'" with his firing. Vazquez, 134 F.3d at 36 (alteration omitted) (quoting Acosta-Orozco v. Rodriguez-de-Rivera, 132 F.3d 97, 101 (1st Cir. 1997)).[9]

Affirmed.

---

[9] In granting summary judgment for the defendants, the district court relied primarily on its finding that Del Toro had not shown that either defendant knew about his political beliefs. The court also briefly noted, consistent with our conclusion here, that, "assuming that plaintiff was able to establish a prima facie case, there is still no evidence in the record that would show plaintiff was terminated because of his political affiliation to the NPP."