# United States Court of Appeals
## For the First Circuit

No. 09-2635

ELSIE RODRIGUEZ-SANCHEZ, et al.,

Plaintiffs, Appellants,

v.

MUNICIPALITY OF SANTA ISABEL, et al.,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Salvador E. Casellas, U.S. District Judge]

Before

Lynch, Chief Judge,
Lipez and Howard, Circuit Judges.

Frank D. Inserni Milam, with whom Carlos J. Morales Bauza was on brief, for appellants.
Jorge Martínez-Luciano, with whom Johanna M. Emmanuelli-Huertas was on brief, for Municipality of Santa Isabel.
Susana I. Peñagarícano-Brown, Assistant Solicitor General, with whom Irene S. Soreta-Kodesh, Solicitor General, Leticia Casalduc-Rabell, Deputy Solicitor General, and Zaira Z. Girón-Anadón, Deputy Solicitor General, were on brief, for Enrique H. Questell-Alvarado and Natalie Rodríguez-Cardona.

September 29, 2011

**LIPEZ, Circuit Judge**. Sixty-one terminated employees of the Municipality of Santa Isabel challenge the district court's entry of summary judgment against them on their claims for deprivation of due process and political discrimination, brought under 42 U.S.C. § 1983. After careful consideration of the record, we affirm.

**I.**

## A. Factual Background

In the Puerto Rico general elections of November 2004, Enrique Questell-Alvarado ("Questell"), a member of Puerto Rico's New Progressive Party ("NPP"), was elected Mayor of the Municipality of Santa Isabel ("the Municipality"). He took office on January 10, 2005. In February 2005, Mayor Questell appointed Natalie Rodríguez-Cardona ("Rodríguez") to be director of the city's Human Resources Department.

Prior to Mayor Questell's election, the Popular Democratic Party ("PDP") had been in power in Santa Isabel for eight consecutive years. The 2004 mayoral election was hotly contested, as Mayor Questell bested the incumbent, PDP-affiliated Mayor, Ángel Sánchez. The tension between the parties carried over into the transition process, culminating in Mayor Questell filing a writ of mandamus in a Puerto Rico court in December of 2004 to compel the outgoing Mayor's participation in the transition.

At the time of Mayor Questell's election, the appellants were all employed by the Municipality of Santa Isabel. Twenty-one

-2-

of the appellants were employed in career positions, akin to civil service employment, while the remainder were temporary or transitory employees, or were employed under Puerto Rico's Law 52, which authorizes the Commonwealth of Puerto Rico to fund municipal employee salaries in order to subsidize locally managed programs and ameliorate unemployment.  See Acevedo-Feliciano v. Ruiz-Hernández, 447 F.3d 115, 117 (1st Cir. 2006).

In January 2005, Mayor Questell hired an independent accounting firm to evaluate the state of Santa Isabel's budget. The firm produced a "Transition Report" in February[1] that evaluated the Municipality's financial status at the close of the 2004-2005 fiscal year.  That report indicated that 82% of the Municipality's budget was consumed by payroll and benefits for municipal employees, leaving only 18% of the budget for other expenditures.  The report further indicated that the outgoing administration had spent more than the allocated 50% of the Municipality's budget for the first half of the 2004-2005 fiscal year, in violation of Puerto Rico law, and that, having underestimated expenses and overestimated revenue, the outgoing administration left the Municipality with the functional equivalent of 27% of that budget.  According to audits performed by the Puerto

---

[1] The Transition Report is not itself in the record, but an October 5, 2005, letter from the accounting firm to Mayor Questell summarizes its findings and sets the date of the report's presentation at February 15, 2005.  In his affidavit, Mayor Questell confirmed that he received the Transition Report on February 15.

-3-

Rico Comptroller's Office, the Municipality had accumulated a budgetary deficit of $7,261,639. The audits also showed that Santa Isabel had more municipal employees during the 2004-2005 fiscal year than in any of the six previous fiscal years.

In response to the report, the defendants began terminating individual employees as early as March 30, 2005. In June 2005, the contracts of numerous temporary employees expired and were not renewed. That same month, the Santa Isabel Municipal Legislature passed Municipal Ordinance #28 ("Ordinance 28"), which approved a broad plan to lay off, transfer, or demote municipal employees in accordance with the needs of the Municipality and the availability of municipal funds. Ordinance 28 mandated that "the least efficient employees will be the first to be dismissed" unless the Municipality lacked valid information about employee performance. If such information was lacking, Ordinance 28 required employee terminations to be based exclusively on seniority. Mayor Questell signed Ordinance 28 into law on June 27, 2005, at which time it was posted on bulletin boards in every department of the Municipality.

As of June 2005, the Municipality did not have a reliable system for evaluating the job performance of its career employees. The previous Mayor had signed into law an ordinance "to enact the implementation of an evaluation and motivation system for Santa Isabel municipal employees." According to a certification signed by Mayor Questell, however, the evaluation system had never been

-4-

used.  A municipal audit conducted in 2005 further confirms this fact.

On August 1, 2005, in conformance with the procedural requirements of Ordinance 28, the Municipality's Human Resources Department provided each career employee with a written calculation of his or her years of service based on a review of the employee's personnel file.[2]  The notice explicitly referenced Ordinance 28, and it advised employees of their right to submit a request for corrections to the calculation.  Nineteen municipal employees, including six plaintiffs in this case, exercised this right.  The Human Resources Department produced an amended seniority list, copies of which were posted on bulletin boards at Santa Isabel's City Hall.

On September 1, 2005, Mayor Questell ordered Rodríguez to perform an evaluation of the existing positions within the Municipality and to submit her recommendation as to the number of positions that could be eliminated in order to alleviate the budgetary deficit.  On September 12, Rodríguez informed Mayor Questell by letter that eighty-five job posts could be eliminated from within the Municipality.  The letter stated that this number was aggregated from information provided by the managers or directors of nine municipal departments when asked about the positions whose elimination would cause "the less severe impact" on

_____

[2] It is undisputed that Mayor Questell did not have any involvement in the review of personnel files or in this notification process.

-5-

the provision of municipal services. It did not identify the employees who occupied the positions that would be eliminated, but merely stated how many of each type of municipal job the department managers considered expendable.

On September 15, Mayor Questell ordered Rodríguez to eliminate forty-six of the eighty-five positions recommended. According to an affidavit signed by Rodríguez, she did not have any personal involvement in deciding which jobs within the Municipality would be eliminated. Mayor Questell did not review any personnel files or make any individualized determinations before issuing this order, nor did he discover the identities of the terminated employees until their termination letters had been prepared.[3] Within each job type, Mayor Questell ordered that the dismissals were to be based strictly on seniority.

On October 17, the Municipality approved a municipal ordinance that amended Ordinance 28 by allowing the Municipality to consider other alternatives to employee terminations if financially viable. The next day, as rumors of imminent layoffs spread, a group of municipal employees politically affiliated with the PDP, including many of the plaintiffs in this case, gathered in front of Santa Isabel City Hall to protest. Several NPP-affiliated

---

[3] The order from Mayor Questell employed the same position-focused identification convention as had the recommendation letter by Rodríguez. For example, Mayor Questell ordered the termination of three Nurse positions (three had been recommended), eleven Office Clerk I positions (twenty-two had been recommended), and zero Janitor positions (six had been recommended).

employees who remained inside City Hall mocked and laughed at the protesters.

On the day of the protests, written termination notices were provided to the selected career employees of the Municipality, including the plaintiffs. The notices advised that the terminations were to take effect in 30 days. They also informed employees of their right to appeal the termination to the Puerto Rico Appellate Commission of the Human Resources System. Nineteen career employees appealed their terminations through this process.[4]

## B. Procedural History

In June 2006, the sixty-one appellants, along with thirty-seven other plaintiffs, filed this civil rights suit in federal district court, pursuant to 42 U.S.C. § 1983. The complaint alleged that the defendants had unconstitutionally terminated the plaintiffs on account of their political affiliation with the PDP, and had failed to provide those plaintiffs who had been career employees, including twenty-one of the appellants here, with a pre-termination hearing to which they were constitutionally entitled. The plaintiffs also brought supplemental state tort claims under articles 1802 and 1803 of the Puerto Rico Civil Code, P.R. Laws Ann. tit. 31, §§ 5141-5142.[5]

---

[4] The outcome of those appeals is not reflected in the record.

[5] The plaintiffs' complaint encompassed numerous other claims that were dismissed at an early stage of the litigation pursuant to Federal Rule of Civil Procedure 12(b)(6). Additionally, the claims of nine plaintiffs were dismissed because they failed to attend scheduled depositions. Those dismissals are not before us.

In due course, the defendants moved for summary judgment on all counts against all plaintiffs. The district court granted that motion in part. In its opinion and order, the district court held that the due process claims of the plaintiffs who had been career employees were foiled by the Parratt-Hudson doctrine.[6] The court characterized the defendants' failure to provide those plaintiffs with a pre-termination hearing as a "random and unauthorized deprivation." It then reasoned that the plaintiffs' claims could not succeed because they had failed to show that the available post-deprivation remedies were inadequate. The court also rejected the political discrimination claims of all but twenty-three plaintiffs because they had not shown that Mayor Questell, who made the ultimate decision to terminate their employment, knew of their political affiliation. The court denied the motion with respect to the political discrimination claims of the twenty-three plaintiffs whose political affiliation Mayor Questell admitted to knowing in his deposition.[7]

---

[6] As we recently noted, "Parratt-Hudson provides that, where 'a deprivation of a property interest is occasioned by random and unauthorized conduct by state officials, . . . the due process inquiry is limited to the issue of the adequacy of postdeprivation remedies provided by the state.'" San Gerónimo Caribe Project, Inc. v. Acevedo-Vilá, No. 09-2566, 2011 WL 2436607, at *5 (1st Cir. June 17, 2011) (alteration in original) (quoting Chmielinski v. Massachusetts, 513 F.3d 309, 315 (1st Cir. 2008)). See generally Hudson v. Palmer, 468 U.S. 517 (1984); Parratt v. Taylor, 451 U.S. 527 (1981).

[7] Those plaintiffs reached a settlement agreement with the defendants shortly thereafter.

This appeal followed. After the appeal was docketed, but before oral argument, five appellants requested the voluntary dismissal of their appeal, which we granted.

## II.

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also, e.g., Leavitt v. Corr. Med. Servs., Inc., 645 F.3d 484, 496 (1st Cir. 2011). "A disputed fact is 'material' only if its existence vel non has the potential to change the outcome of the suit." Nolan v. CN8, No. 10-2239, 2011 WL 3795606, at *5 (1st Cir. Aug. 29, 2011). At this stage, we view the record evidence in the light most favorable to the non-movant. Id. If a movant has averred that there is an absence of evidence to support the cause of action, the burden shifts to the non-movant to establish, through "definite, competent evidence," an issue worthy of trial. Meuser v. Fed. Express Corp., 564 F.3d 507, 515 (1st Cir. 2009) (quoting Mesnick v. Gen. Elec. Co., 950 F.2d 816, 822 (1st Cir. 1991) (internal quotation mark omitted)). Our review is de novo, and we may accordingly affirm the entry of summary judgment on any ground apparent from the record. E.g., Méndez-Aponte v. Bonilla, 645 F.3d 60, 64 (1st Cir. 2011).

## A. Due Process

As noted, twenty-one appellants held career positions with the Municipality prior to their termination. Under the laws

of Puerto Rico, career employees have a property interest in maintaining their employment that is protected by the Fourteenth Amendment to the United States Constitution. Colón-Santiago v. Rosario, 438 F.3d 101, 108 (1st Cir. 2006). Depending on context, employees often, but not always, may not be deprived of continued employment without notice and a meaningful opportunity to be heard in advance of the termination. See generally Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 542-43 (1985). Here, the parties all agree that the appellants were not afforded a pre-termination hearing.

However, pre-termination hearings are not always required. We have held that pre-termination hearings are not required by due process where a bona fide government reorganization plan bases dismissals on factors unrelated to personal performance. Whalen v. Mass. Trial Ct., 397 F.3d 19, 25 (1st Cir. 2005); see also Duffy v. Sarault, 892 F.2d 139, 147 (1st Cir. 1989). Because such a plan is aimed at positions of employment rather than at individual employees, a pre-termination hearing would be a futile exercise. Whalen, 397 F.3d at 25; Hartman v. City of Providence, 636 F. Supp. 1395, 1411 (D.R.I. 1986) ("[S]ince there are no charges against the employee . . . there would be no occasion for a hearing, and it would be idle to hold one." (quoting Kusza v. Maximonis, 70 A.2d 329, 331 (Pa. 1950) (internal quotation mark omitted))). Accordingly, "[w]here a reorganization or other cost-

cutting measure results in dismissal of an employee no hearing is due." Duffy, 892 F.2d at 147.

Because the district court based its decision on the Parratt-Hudson doctrine, neither party has argued that the nature of the reorganization plan in this case provided an alternative ground for concluding that no pre-termination hearings were necessary. Nevertheless, in arguing that the dismissals at issue were driven by the financial crisis in the Municipality and not by political considerations, the appellees have set forth in the summary judgment record the facts necessary to support the reorganization exception, and the appellants have had a full opportunity to challenge them. Given that our review on summary judgment is plenary, Méndez-Aponte, 645 F.3d at 64, that we can affirm on any basis apparent in the record, and that the applicability of the reorganization exception in this case is so plain, we choose to apply it.

There is no disputing that Santa Isabel was in a dire financial situation when Mayor Questell assumed office, with an accumulated budget deficit in excess of $7,000,000, or that the situation was attributable in large part to the size of the municipal workforce. Nor is there any question that the layoff plan, in fact, alleviated that situation. According to an audit conducted in 2008, the Municipality's accrued deficit decreased by nearly $4,000,000 in the first two years under Mayor Questell's administration. The audit also shows that, over that two-year

-11-

period, the total number of municipal employees decreased by roughly 25% while the municipality's payroll was cut almost in half. The need for, and the benefits from, Ordinance 28 are manifest.

Of course, an incoming administration may not use a systematic reorganization to effectuate otherwise impermissible terminations. Borges Colón v. Román-Abreu, 438 F.3d 1, 6 (1st Cir. 2006). In this instance, the plaintiffs' accompanying political discrimination claim makes clear that they view the seniority-based layoff plan as a stratagem to oust employees hired by, and thus affiliated with, the outgoing PDP administration. We have encountered similar claims numerous times, often as a result of administration changes following elections in Puerto Rico. Id.

However, there is no evidence of pretext here. The appellants emphasize various record evidence that is insufficient, both individually and cumulatively, to create a triable issue. For example, the appellants point to Rodríguez's deposition testimony, in which she stated that the Municipality had approximately fifty more employees in June of 2008 than it did at the time of the layoffs in 2005, and that she does not recall the Municipality instituting a hiring freeze immediately following the layoffs. This evidence is incomplete and equivocal, at best. First, an absolute increase in the number of municipal employees over a three-year period, with no distinction drawn between career employees, temporary or contract employees, or even Commonwealth-

funded employees under Law 52, does not indicate that the layoffs in 2005 were needless or pretextual. Moreover, as noted above, the Comptroller's auditing report from 2008 confirms that the absolute number of municipal employees decreased in each of the first two years under Mayor Questell. Rodríguez's comment does not, as the plaintiffs contend, demonstrate that "in spite of the alleged financial crisis, the Municipality continued to hire new employees throughout 2005, 2006, 2007, and 2008."

Second, Rodríguez explained in her deposition that she does not recall whether the Municipality instituted a hiring freeze because the positions that were subject to Ordinance 28 were removed from the municipal budget entirely. In other words, the positions at issue no longer existed within the Municipality, so there were no open positions to fill. Thus, Rodríguez's failure to recall whether a hiring freeze was implemented is not probative of whether the Municipality conducted any hiring in 2005. The only record evidence that directly speaks to municipal hiring in 2005 is Mayor Questell's unequivocal assertion in his deposition that, in 2005, "we were not hiring and there was a reduction in all [departments], including mine in particularly [sic]."

Likewise, the appellants suggest that the defendants' use of a seniority ranking only for the positions selected for layoffs, instead of an across-the-board seniority ranking, shows that certain defendants were targeted for layoffs and that seniority was not, in fact, the basis for the termination decisions. We

-13-

disagree.  In general, one would expect a bona fide administrative reorganization plan to focus on particular positions that would be eliminated.  A layoff plan based exclusively on seniority, without regard to the jobs the terminated employees performed, would pose considerable challenges, including the possibility of added expense and inefficiency by requiring the Municipality to re-train more senior employees in new roles based on the needs of the public.  Moreover, because the appellants have failed to adduce evidence showing that Mayor Questell had knowledge of the identities or political affiliations of the workers in each position, the suggestion that particular positions were selected for elimination in order to target the appellants on the basis of their political affiliation is speculative and unsupported.  See Méndez-Aponte, 645 F.3d at 64 ("We ignore any conclusory allegations, improbable inferences, and unsupported speculation." (quoting Del Toro Pacheco v. Pereira, 633 F.3d 57, 62 (1st Cir. 2011) (internal quotation marks omitted))).

The strongest evidence in favor of the plaintiffs' claim of pretext is the admission by Rodríguez that she did not employ any of the alternatives to termination identified in the amendment to Ordinance 28 once the administration had settled on a particular layoff plan.[8]  Even that evidence is insufficient, however.  The amendment to Ordinance 28 required the defendants to consider

---

[8] These alternatives included the transfer of employees to similar posts in programs not affected by the reduction in force, retraining, work schedule reduction, furlough, and demotion.

alternatives to termination only if they viewed the use of such alternatives to be financially feasible. The record is devoid of evidence that would support the conclusion that the defendants' insistence upon proceeding with terminations was the product of a political motive, and it provides no ground for us to second-guess the defendants' appraisal of what approaches were or were not financially feasible. "The mere fact that the impact falls mainly on members of the party which has lost power is not, of course, sufficient to warrant federal court interference with the policy choices of a new administration which reflects the voters' choice that changes are desirable." Borges Colón, 438 F.3d at 6.

In short, the evidence in the summary judgment record is insufficient to allow a reasonable jury to conclude that Ordinance 28 was anything other than a bona fide reduction in force in response to the Municipality's financial troubles. Accordingly, the defendants' failure to provide pre-termination hearings did not deprive plaintiffs of due process.

## B. Political Discrimination

All of the appellants claim that the termination decisions constituted impermissible political discrimination, in violation of the First and Fourteenth Amendments. A triable claim of political discrimination under 42 U.S.C. § 1983 requires, among other things, evidence that political affiliation was a substantial or motivating factor in the conduct being challenged. See Del Toro Pacheco, 633 F.3d at 63. Even if a plaintiff makes a prima facie

-15-

showing that the government acted from politically discriminatory motives, a defendant may avoid liability by proving that he or she inevitably would have taken the same action without regard to politics.  See generally Mt. Healthy Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274 (1977).  "Thus, even if the defendant's actions were motivated in part by the plaintiff's protected conduct, the defendant can still prevail if he or she can show that the protected conduct was not the 'but-for' cause of the adverse action." Rodríguez-García v. Miranda-Marín, 610 F.3d 756, 767 (1st Cir. 2010).  More specifically, "when a new administration decides to reorganize or take other cost-cutting measures after winning an election and thereby eliminates the jobs of the plaintiffs, the defendants' decision will be upheld if they can demonstrate that the reorganization would have occurred regardless of the political affiliation of the plaintiffs."   Acevedo Cordero v. Cordero Santiago, 764 F. Supp. 702, 709 (D.P.R. 1991).

        In the present case, the district court concluded that the appellants had failed in their burden of producing evidence sufficient to show that the termination decisions were politically motivated.  It held that, with the exception of the twenty-three plaintiffs identified earlier, the plaintiffs had failed to establish that Mayor Questell was aware of the political affiliation of the affected employees.  We need not separately address that conclusion.  Our determination in the due process analysis that the reorganization was bona fide, and thus not

pretextual, necessarily means that the defendants have satisfied their burden of showing that Ordinance 28 would have been implemented irrespective of the political affiliation of those who were terminated.  See Duffy, 892 F.2d at 147 ("[B]ecause the district court determined that the reorganization was valid for purposes of Mt. Healthy, another finding on that point under due process was unnecessary.").  The success of that defense obviates the need for additional analysis of the record evidence.

## III.

For the foregoing reasons, the district court's entry of summary judgment is affirmed.

So ordered.