In the

# United States Court of Appeals
## For the Seventh Circuit

No. 14-2328

JOHN T. DIBBLE,

*Plaintiff-Appellant,*

*v.*

PATRICK J. QUINN, Governor of Illinois, *et al.,*

*Defendants-Appellees.*

Appeal from the United States District Court for the
Southern District of Illinois.
No. 13-cv-632 — **David R. Herndon**, *Judge.*

No. 14-2746

PETER AKEMANN,

*Plaintiff-Appellant,*

*v.*

PATRICK J. QUINN, Governor of Illinois, *et al.,*

*Defendants-Appellees*.

Appeal from the United States District Court for the
Central District of Illinois.
No. 11-cv-3213 — **Colin S. Bruce**, *Judge.*

_____

ARGUED APRIL 22, 2015 — DECIDED JULY 20, 2015

Before FLAUM, MANION, and HAMILTON, *Circuit Judges*.

HAMILTON, *Circuit Judge*. Plaintiffs John Dibble and Peter Akemann were arbitrators for the Illinois Workers' Compensation Commission. They lost their positions after the Illinois legislature passed Public Act 97–18. The law was signed on June 28, 2011 and took effect just three days later, ending the terms of all incumbent arbitrators effective July 1, 2011 and providing that the Governor of Illinois would make new appointments. The new law allowed incumbent arbitrators to serve past July 1 as holdovers until the Governor made new appointments. By July 1, 2012, both Dibble and Akemann had lost their positions.

Plaintiffs filed separate lawsuits raising the same claims. They alleged that by shortening their six-year terms as arbitrators under the prior law, Public Act 97–18 deprived them of a property interest without due process of law in violation of the Fourteenth Amendment to the U.S. Constitution. Their suits named as defendants then-Governor of Illinois Patrick Quinn and all members of the Illinois Workers' Compensation Commission, all in both their individual and official capacities. Both district courts entered judgments for defendants.

We affirm both judgments. Plaintiffs' claims for injunctive relief are moot, and the defendants are entitled to qualified immunity on plaintiffs' claims for damages. Even if plaintiffs plausibly allege a constitutional violation, the applicable law was not clearly established under the circum-

stances of these cases, where a statutory amendment eliminated the property interest that a statute had previously conferred.

I.   *Factual & Procedural Background*

Plaintiff John Dibble was first appointed as an arbitrator in 1990 and then reappointed to six-year terms in 1996, 2002, and 2008. His last appointment was set to expire in 2014. Plaintiff Peter Akemann was first appointed in 1994 and then reappointed to six-year terms in 2000 and 2006. His last appointment was set to expire in 2012.

The Illinois Workers' Compensation Act, 820 ILCS 305/1 *et seq.*, establishes the power to appoint arbitrators. When plaintiffs were last appointed, the law provided that each arbitrator would be appointed for a term of six years, with the possibility of reappointment. 820 ILCS 305/14, P.A. 94–277 (2005). During terms of service, arbitrators were subject to the provisions of the Illinois Personnel Code, which meant they could be removed from their positions only for cause. *Id.*; see also 20 ILCS 415/8b.18.

On June 28, 2011 Governor Quinn signed Public Act 97–18. The Act replaced the provision establishing six-year terms for the arbitrators with a provision that set up a one-time appointment procedure. Under the new Act, the terms of all incumbent arbitrators would end just three days later, on July 1, 2011, regardless of when their terms would have ended under the old law. The incumbents would continue to exercise all of their duties until either they were reappointed (all former arbitrators were permitted to apply for new appointments) or their successors were named. The new Act gave Governor Quinn the power to make new appointments,

generally for three-year terms. Plaintiffs allege that approx-imately twenty of the twenty-nine incumbent arbitrators were reappointed to their positions. Dibble was not among them. Akemann was reappointed but only for a transitional one-year term that ended on July 1, 2012.[1] The new law also provides that its changes "prevail over any conflict with the Personnel Code," effectively removing the for-cause protec-tion that arbitrators had enjoyed. See 820 ILCS 305/14, P.A. 97–18 (2011). Other changes made by Public Act 97–18 are not pertinent to these appeals.

Plaintiffs' six-year terms of service were cut short by Pub-lic Act 97–18. Each filed a two-count complaint under 42 U.S.C. § 1983 alleging that he was terminated without cause and without notice and an opportunity to be heard in viola-tion of the Fourteenth Amendment's Due Process Clause. Plaintiffs also alleged that they were deprived of a liberty interest under the Fourteenth Amendment when Governor Quinn issued a press release announcing the overhaul of the Commission. The district court in Dibble's case dismissed both claims under Federal Rule of Civil Procedure 12(b)(6). The district court in Akemann's case granted defendants summary judgment on both claims under Rule 56. Plaintiffs appeal the dismissals of their property interest claims but not the dismissals of their liberty interest claims.

Plaintiffs sued for money damages and equitable relief in the form of reinstatement to their positions as arbitrators.

---

[1] Arbitrators for the reconfigured Commission generally serve three-year terms, but the first, transitional terms were staggered by appointing some in 2011 to one- and two-year terms. Akemann was not reappointed in 2012.

Plaintiffs concede correctly on appeal, however, that their claims for reinstatement are now moot because the six-year terms they were serving in 2011 have expired. See *Medlock v. Trustees of Indiana Univ.*, 683 F.3d 880, 882 (7th Cir. 2012) (dismissing appeal as moot where plaintiff sought to enjoin academic suspension but term of suspension had expired by time of appeal). We are left with only plaintiffs' claims for damages. Because all defendants are current or former state officials sued for their official acts, damages are available against them under § 1983 only in their individual capacities. See *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71 (1989).

II.  *Analysis*

   A.  *Standard of Review*

We review *de novo* dismissals under both Rule 12(b)(6) and Rule 56. E.g., *Vinson v. Vermilion County*, 776 F.3d 924, 928 (7th Cir. 2015) (motion to dismiss); *Mintz v. Caterpillar Inc.*, — F.3d —, 2015 WL 3529396, at *5 (7th Cir. June 5, 2015) (summary judgment). The issues here are pure questions of law: whether plaintiffs had a constitutionally protected property interest in their six-year terms as arbitrators, see *Cole v. Milwaukee Area Technical College Dist.*, 634 F.3d 901, 904 (7th Cir. 2011); if so, whether the legislative process that produced Public Act 97–18 satisfied federal due process requirements, see *Lobzun v. United States*, 422 F.3d 503, 507 (7th Cir. 2005); and if not, whether defendants are entitled to qualified immunity because the law was not clearly established that their actions violated plaintiffs' constitutional rights, see *Chasensky v. Walker*, 740 F.3d 1088, 1093–95 (7th Cir. 2014). Because the result is the same despite the differences between Rule 12(b)(6) and Rule 56, we have based our

decision in both appeals on plaintiffs' complaints alone, accepting as true all factual allegations in the complaints (which are virtually identical) and drawing from the allegations all reasonable inferences in plaintiffs' favor. E.g., *Lodholtz v. York Risk Services Group, Inc.*, 778 F.3d 635, 639 (7th Cir. 2015). We can affirm on any ground supported by the record so long as the issue was raised and the losing parties had a fair opportunity to contest the issue in the district court. E.g., *Locke v. Haessig*, — F.3d —, 2015 WL 3528782, at *3 (7th Cir. June 5, 2015).

B. *Qualified Immunity*

"Qualified immunity shields government officials from civil damages liability unless the official violated a statutory or constitutional right that was clearly established at the time of the challenged conduct." *Reichle v. Howards*, 566 U.S. —, 132 S. Ct. 2088, 2093 (2012). To decide whether government officials are entitled to qualified immunity, courts ask two questions: first, whether the facts or allegations, taken in the light most favorable to plaintiffs, constitute a violation of a statutory or constitutional right, and second, whether that right was clearly established at the time of the alleged violation. E.g., *Weinmann v. McClone*, 787 F.3d 444, 448 (7th Cir. 2015). We have discretion to decide a case under the second step "without resolving the often more difficult question whether the purported right exists at all." *Reichle*, 132 S. Ct. at 2093, citing *Pearson v. Callahan*, 555 U.S. 223, 227 (2009). We take that approach here.

To be "clearly established," a right must be defined so clearly that every reasonable official would have understood that what he was doing violated that right. *Reichle*, 132 S. Ct. at 2093. Although "clearly established" does not require a

case directly on point, "existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. —, 131 S. Ct. 2074, 2083 (2011). The right allegedly violated must be established "not as a broad general proposition" but in a "particularized" sense so that the "contours" of the right are clear to a reasonable official. *Reichle*, 132 S. Ct. at 2094; see also *City of San Francisco v. Sheehan*, 575 U.S. —, 135 S. Ct. 1765, 1776–77 (2015); *Plumhoff v. Rickard*, 572 U.S. —, 134 S. Ct. 2012, 2023–24 (2014).

### C. *Plaintiffs' Due Process Claims*

#### 1. *The Property Interest*

The Fourteenth Amendment's Due Process Clause does not itself create any property interests. It protects property interests that "are created and … defined by existing rules or understandings that stem from an independent source such as state law." *Board of Regents v. Roth*, 408 U.S. 564, 577 (1972). That independent source of law can include "a statute, regulation, municipal ordinance, or an express or implied contract." *Covell v. Menkis*, 595 F.3d 673, 675 (7th Cir. 2010).

"To have a protectable property interest in a benefit, such as continued employment, a plaintiff must have more than an 'abstract need or desire for it' and more than a 'unilateral expectation of it.' Instead, a plaintiff must have a 'legitimate claim of entitlement to it.'" *Cole v. Milwaukee Area Technical College Dist.*, 634 F.3d 901, 904 (7th Cir. 2011), quoting *Roth*, 408 U.S. at 577. In general, a public employee has a legitimate claim of entitlement to continued employment "when an employer's discretion is clearly limited so that the employee cannot be denied employment unless specific conditions are met." *Colburn v. Trustees of Indiana Univ.*, 973 F.2d

581, 589 (7th Cir. 1992). Although we look to state law for the source of the plaintiff's alleged property interest, whether a particular state-created interest rises to the level of a "legitimate claim of entitlement" is a question of federal law. *Memphis Light, Gas & Water Division v. Craft*, 436 U.S. 1, 9 (1978).

Plaintiffs had a constitutionally protected property interest in their positions as arbitrators up until July 1, 2011, when Public Act 97–18 took effect to shorten their terms. Under the prior version of the law, plaintiffs had a legitimate expectation of continued employment during their six-year terms because they could be removed only for cause during that span. See *Cleveland Board of Educ. v. Loudermill*, 470 U.S. 532, 538–40 (1985) (civil service employees who could be dismissed only for cause had constitutionally protected property interest in continued employment). Plaintiffs were discharged without cause before their six-year terms expired. They did not receive the notice and individual opportunity to be heard that ordinarily must be made available before a deprivation of property.

### 2. *Legislative Due Process*

If a state official had simply wanted to remove the plaintiffs from their posts, they would have had a federal constitutional right to prior notice and a meaningful opportunity to be heard before the decision was made. In this case, though, the alleged deprivation was caused by the legislature's enactment of Public Act 97–18. The issue on the merits is whether that legislation deprived plaintiffs of their property interests without due process of law. Framing the question that way leads us to a line of cases dealing with legislation

that deprived people of property interests granted by earlier legislation.[2]

We begin with *Atkins v. Parker*, 472 U.S. 115 (1985). In *Atkins* the Supreme Court considered a due process challenge to an amendment to the Food Stamp Act. The amendment reduced or eliminated benefits that certain low-income families had been receiving under the law. The Court noted that food stamps, like the welfare benefits at issue in *Goldberg v. Kelly*, 397 U.S. 254 (1970), were a type of statutory entitlement that could be considered "property" under the Due Process Clause, but it rejected the plaintiffs' due process challenge.

The *Atkins* Court explained that the plaintiffs were challenging "a legislatively mandated substantive change in the scope of the entire program," not "the procedural fairness of individual eligibility determinations." 472 U.S. at 129. Congress has "plenary power to define the scope and the duration of the entitlement to food-stamp benefits, and to increase, to decrease, or to terminate those benefits based on

---

[2] Defendants argue that plaintiffs lost their protected property interests in continued employment as soon as the legislature passed Public Act 97–18. This argument begs the real question. We rejected a similar argument in *Youakim v. McDonald*, 71 F.3d 1274, 1288–89 (7th Cir. 1995), where legislation effectively terminated foster care benefits for children living in unlicensed homes. Noting that the defense argument was "tautological," we explained that the government "may not defend against a due process claim … by arguing that the plaintiff now lacks a protectable property interest by virtue of the very state action the plaintiff has challenged." *Id.* at 1289, citing *Bennett v. Tucker*, 827 F.2d 63, 73 (7th Cir. 1987) ("a state may not deprive an individual of his or her property interest without due process, and then defend against a due process claim by asserting that the individual no longer has a property interest").

its appraisal of the relative importance of the recipients' needs and the resources available to fund the program." *Id.* The prior version of the Food Stamp Act "did not include any right to have the program continue indefinitely at the same level," nor did it "qualify the legislature's power to substitute a different, less valuable entitlement at a later date." *Id.* Under these circumstances, "'[A] welfare recipient is not deprived of due process when the legislature adjusts benefit levels. … [T]he legislative determination provides all the process that is due.'" *Id*. at 129–30, quoting *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 432–33 (1982) (alterations in original).

*Atkins* reflects the general rule that the legislature, having created a statutory entitlement, is not precluded from altering or even eliminating the entitlement by later legislation. Were the rule otherwise, "[s]tatutes would be ratchets, creating rights that could never be retracted or even modified without buying off the groups upon which the rights had been conferred." *Pittman v. Chicago Board of Educ.*, 64 F.3d 1098, 1104 (7th Cir. 1995); see also *Wisconsin & Michigan Ry. Co. v. Powers*, 191 U.S. 379, 387 (1903) ("the legislature is not making promises, but framing a scheme of public revenue and public improvement"). People who would be affected by the later legislation are not left unprotected, however. They have the opportunity to contest the legislative determination through the processes of representative government. See generally *Bi-Metallic Investment Co. v. State Board of Equalization*, 239 U.S. 441, 445 (1915) ("General statutes within the state power are passed that affect the person or property of individuals, sometimes to the point of ruin, without giving them a chance to be heard. Their rights are protected in the only way that they can be in a complex society, by

their power, immediate or remote, over those who make the rule.").

Courts have often followed this logic to reject due process challenges to legislation that has changed the duration or conditions of civil service appointments. See *Rea v. Matteucci*, 121 F.3d 483, 484–85 (9th Cir. 1997) (no due process violation where statute reclassified employee from permanent to non-permanent status); *McMurtray v. Holladay*, 11 F.3d 499, 504 (5th Cir. 1993) (no due process violation where statute provided that personnel actions of state agency would be exempt from procedures of merit review system); *Gattis v. Gravett*, 806 F.2d 778, 780–81 (8th Cir. 1986) (no due process violation where legislature amended civil service code to eliminate for-cause protection for certain personnel in county sheriff departments); *Grobsmith v. Kempiners*, 430 N.E.2d 973, 975 (Ill. 1981) ("We find no constitutional impediment to the power of the General Assembly to change the duration of the term of the appointments or the method of fixing the time when presently existing terms would terminate."); *Jordan v. Metropolitan Sanitary Dist. of Greater Chicago*, 155 N.E.2d 297, 304 (Ill. 1958) ("The legislature, having created the office or public position, may alter its terms or abolish it entirely."); *Groves v. Board of Educ. of Chicago*, 10 N.E.2d 403, 406 (Ill. 1937) (same); *Higgins v. Sweitzer*, 126 N.E. 207, 208 (Ill. 1920) (same); *People ex rel. Akin v. Loeffler*, 51 N.E. 785, 791 (Ill. 1898) (same).

A good example is *Fumarolo v. Chicago Board of Education*, 566 N.E.2d 1283 (Ill. 1990). For many years principals in the Chicago public schools had tenure. In 1988 the Illinois legislature eliminated their tenure in the Chicago School Reform Act, Ill. Rev. Stat. 1989, ch. 122, par. 34–1.01 *et seq.* The new

law replaced the tenure model with a system of renewable four-year contracts. A group of principals challenged the constitutionality of the law, arguing that the elimination of tenure violated due process because each principal had a property interest in "permanent" employment.

The Illinois Supreme Court agreed with the plaintiffs that they had a property interest in permanent employment but found no due process violation: "Although the Act contains no procedures by which individual teachers are accorded a hearing or opportunity to protest the termination of 'permanent' employment status, the legislative process itself created all the procedural safeguards necessary to provide the plaintiffs with due process." *Id.* at 1307.

### 3. *Plaintiffs' Arguments for an Exception*

Plaintiffs Dibble and Akemann acknowledge the general rule that the legislative process satisfies due process requirements when property interests created by statute are modified or eliminated. They argue for an exception, though, when the legislative decision eliminating the property interest was pretextual, designed to harm a single employee or a small group of employees. In support of this exception, they rely on two cases, *Misek v. City of Chicago*, 783 F.2d 98 (7th Cir. 1986), and *Schulz v. Green County*, 645 F.3d 949 (7th Cir. 2011). Neither case addressed a situation like this one.

In *Misek* tenured city employees were fired without a hearing. Their property interest derived from the Illinois Municipal Code and a Chicago ordinance, both of which said they could be removed only for cause. *Misek*, 783 F.2d at 100. Unlike this case, neither law had been changed by legis-

lative action. Rather, the city fired the plaintiffs as part of a purported "reorganization" and argued that individual pre-termination hearings were not required because the firings occurred as part of a wide-scale reorganization. This principle, which *Misek* called the "reorganization exception," *id.*, is based on the idea that a hearing is unnecessary when the dismissal is caused by economic or administrative factors unrelated to the employee's job performance. Under these circumstances, an individual hearing is "a futile exercise" because the termination decision does not depend on factors related to the individual employee. See *Rodriguez-Sanchez v. Municipality of Santa Isabel*, 658 F.3d 125, 130 (1st Cir. 2011).[3]

*Misek* recognized the reorganization exception but still reversed the district court's dismissal, explaining that the plaintiffs' claim fell outside the exception because they alleged that "the so-called reorganization … was purely pretextual in an effort to replace plaintiffs with others favored by the acting Executive Director of the agency." *Misek*, 783 F.2d at 100. Relying on this portion of *Misek*, plaintiffs argue that Public Act 97–18 purported to effect a broad change to the workers' compensation system but was actually a pretext for removing particular individuals.[4]

---

[3] Other courts have recognized the reorganization exception. See, e.g., *Duffy v. Sarault*, 892 F.2d 139, 147 (1st Cir. 1989) (citing *Misek* and discussing the "reorganization exception" to due process hearings); *Hartman v. City of Providence*, 636 F. Supp. 1395, 1410 (D.R.I. 1986) (collecting cases).

[4] We say "change" rather than "reorganization" because none of the arbitrators' positions were eliminated by Public Act 97–18. There were twenty-nine spots both before and after the amendment.

The crucial difference between *Misek* and this case is that in *Misek* there was no process at all. The statutes that gave the *Misek* plaintiffs their property interest had not been modified by legislative action. Rather, the plaintiffs' deprivation was caused by the non-legislative decision of the defendant agency. Cases recognizing the reorganization exception say that in this situation a pre-termination hearing is not necessary if it would be pointless. But those cases do not say that the legislative process, provided here by the Illinois legislature's enactment of Public Act 97–18, is insufficient to provide due process. In fact, *Atkins* and *Logan* make clear that the opposite is true. See *Atkins*, 472 U.S. at 129–30; *Logan*, 455 U.S. at 432–33.

Plaintiffs also rely on *Schulz v. Green County*, which is closer to the situation presented here but still fails to establish clearly the constitutional right plaintiffs invoke. (Even if it had, it could not help these plaintiffs. *Schulz* was decided three weeks after Public Act 97-18 was enacted and took effect.) In *Schulz* the plaintiff had been employed under the supervision and control of a county court. The county board of supervisors passed a resolution moving the position from the court to a different county department. When the county board made this change, the plaintiff kept her employment and continued to perform many of her same job duties, but she lost seniority and wage benefits because she could no longer be considered a supervisor. 645 F.3d at 951–52. Unlike in *Misek*, the challenged action was legislative because the plaintiff's reassignment and loss of benefits were caused by the county board action.

We affirmed summary judgment for the defendant county, holding that the plaintiff was not entitled to a hearing. We

explained that "welfare recipients have property rights in their benefits, but only in the sense that they may have legitimate claims of entitlement to whatever benefits the legislature creates." *Id.* at 952, citing *Atkins*, 472 U.S. 115, and *Bowen v. Gilliard*, 483 U.S. 587 (1987) (no due process violation where Congress amended statute to reduce federal aid to families with dependent children). This part of *Schulz*, which would have been sufficient to resolve the plaintiff's claim in that case, reflects the *Atkins* principle that the legislative process satisfies due process requirements and points to dismissal of plaintiffs' claims here.

But *Schulz* also included some broader language that plaintiffs have seized upon. Citing *Misek*, but without addressing the distinction between legislative and non-legislative acts, we wrote:

> A governmental reorganization … does not always avoid the need for due process. When a purportedly legislative decision affects one person (or a small number of people, as in *Misek*), it is possible that the effect of the reorganization on a single person is the object of the exercise rather than the byproduct. In those cases, it is possible to ask whether the reorganization was pretextual, designed to harm a specific employee rather than in spite of her or with indifference to its effects on her.

*Schulz*, 645 F.3d at 953 (citation and footnote omitted). *Schulz* did not explain how a court should undertake this pretext inquiry in a case involving a legislative body. Nor did it discuss the qualification in *Misek* that the court in that case was *not* authorizing an inquiry into the actual motives behind a

reorganization: "The cases relied upon by the district court are easily distinguishable. In each of those cases the plaintiffs were questioning the motives behind actual reorganizations; here plaintiffs allege no reorganization took place." See *Misek*, 783 F.2d at 101.

Plaintiffs contend that the quoted language from *Schulz* clearly establishes that Public Act 97–18 violated their due process rights. Although the Act purported to be a legislative act, they say, it was pretextual because it was designed to eliminate particular arbitrators on the Commission. Recall that the amendment applied to all arbitrators on the Commission and did not single out specific individuals, but approximately twenty of the twenty-nine arbitrators were re-appointed after Public Act 97–18 was enacted. Plaintiffs contend that Governor Quinn used the legislative reorganization as a subterfuge to target nine individual arbitrators he disliked. They also observe that the amendment changed very little about the conditions of service for the arbitrators on the Commission. Terms were shortened from six to three years, but there were no changes to the arbitrators' salary, benefits, responsibilities, or working conditions. Plaintiffs contend that in light of the relatively minor substantive changes, Public Act 97–18 should be considered "adjudicative" rather than legislative, and that adjudicative actions require the familiar procedural safeguards of notice and an individual opportunity to be heard.

We must clarify that the action eliminating plaintiffs' property interest (a fixed term of six years, subject to removal only for cause) was the enactment of Public Act 97–18 by the Illinois legislature, not the Governor's decision to select a new set of appointees that did not include plaintiffs. When

the Governor made his decision to reappoint some arbitrators but not others (in October 2011), plaintiffs had no right under state law to be reappointed. Absent that right, they had no property interest in being selected by the Governor for posts as arbitrators. Thus, plaintiffs can complain only about the legislature's decision to terminate their six-year terms early, on July 1, 2011, before those terms were set to expire.

Even if *Schulz* had been decided before enactment of Public Act 97-18, it would not have clearly established that plaintiffs' due process rights were violated when the legislature cut their terms short by passing Public Act 97–18. Any effort to extend the pretext inquiry from *Misek* into the realm of legislative decision-making would run into the well-settled proposition that "[w]hether an act is legislative turns on the nature of the act, rather than on the motive or intent of the official performing it." *Bogan v. Scott-Harris*, 523 U.S. 44, 54 (1998); see also *Tenney v. Brandhove*, 341 U.S. 367, 377 (1951) (it is "not consonant with our scheme of government for a court to inquire into the motives of legislators"); *Biblia Abierta v. Banks*, 129 F.3d 899, 905 (7th Cir. 1997) ("An inquiry into a legislator's motives for his actions, regardless of whether those reasons are proper or improper, is not an appropriate consideration for the court."). While there are rare exceptions, see, e.g., *Wallace v. Jaffree*, 472 U.S. 38 (1985) (considering legislative purpose of returning prayer to public schools in holding moment-of-silence legislation violated First Amendment), any extension of the *Schulz* dictum on motive to legislative acts is not clearly established law.

The act here was plainly legislative. Public Act 97–18 was passed by the legislature following the normal legislative

process prescribed by the Illinois Constitution. See *Bagley v. Blagojevich*, 646 F.3d 378, 392 (7th Cir. 2011) ("To determine whether an act is legislative in form, courts look at whether the defendants acted pursuant to constitutional or statutory procedures."). The law applied generally to all sitting arbitrators, not just to particular individuals, and applied only prospectively. See *L C & S, Inc. v. Warren County Area Plan Comm'n*, 244 F.3d 601, 604 (7th Cir. 2001) (rejecting argument that legislative zoning ordinance was adjudicative because it targeted a single group of individuals: "Not the motive or stimulus, but the generality and consequences, of an enactment determine whether it is really legislation or really something else."). On every dimension, Public Act 97–18 bears the traditional indicia of legislation.[5]

Plaintiffs ask us to ignore these features of the legislation and instead to divine whether Public Act 97–18 was really motivated by the intent to remove certain individuals. We could not perform this task without considering the motives of the legislators who voted for the law (quite apart from wondering whether plaintiffs have sued the right defendants if the legislation is the heart of their claims). Plaintiffs' reli-

---

[5] *Atkins* noted without elaboration that the plaintiffs in that case did not claim "any defect in the legislative process." 472 U.S. at 130. Some courts have read this language to imply an exception where the legislative process was "defective" in some way. See, e.g., *Rea v. Matteucci*, 121 F.3d 483, 485 (9th Cir. 1997) ("Thus, if plaintiff could show that the legislation here was arbitrary or irrational, or that the legislative process was defective, she would have a triable issue of fact as to whether she had been denied due process."); *Conway v. Sorrell*, 894 F. Supp. 794, 802 (D. Vt. 1995). Plaintiffs do not argue on appeal that the legislative process was defective, and we express no view on whether this exception is viable or what its limits might be.

ance on employment discrimination cases to justify a judicial inquiry into legislative motive is misplaced. Whether a court considers the motive of the defendant in analyzing a plaintiff's claim varies by context and the type of defendant involved. If the claim is based on a statute (e.g., Title VII) or constitutional provision (e.g., equal protection) that prohibits the defendant from taking an action for a particular reason, then courts naturally must consider motive. See *Grossbaum v. Indianapolis-Marion County Building Auth.*, 100 F.3d 1287, 1292–94 (7th Cir. 1996) (explaining why relevance of motive or intent depends on context); *Fraternal Order of Police Hobart Lodge No. 121, Inc. v. City of Hobart*, 864 F.2d 551, 554–57 (7th Cir. 1988) (same). But it is a non sequitur to say that because courts consider motives for some types of claims, they should do so for all types of claims.

Instead, the decisive question is whether motive is relevant to the particular claim at issue. Here, we have found no case clearly establishing that motive is relevant to determining whether a validly enacted statutory amendment eliminating an employee's property interest complies with procedural due process requirements. While *Schulz* suggested that such a pretext inquiry might be appropriate for a "purportedly legislative decision," it did not grapple with *Bogan* or cases like it, which tend to bar this type of judicial inquiry because of the special nature of legislative action. The dictum in *Schulz* falls well short of placing the "constitutional question beyond debate." See *Ashcroft v. al-Kidd*, 563 U.S. —, 131 S. Ct. 2074, 2083 (2011).

None of this is to say, however, that there is no support for a distinction between bona fide legislation and an adjudicative determination dressed up in legislative clothing.

Drawing this line can be difficult and can have broad implications. Compare, e.g., *L C & S, Inc.*, 244 F.3d at 603 (due process not violated by amendment to zoning ordinance that effectively barred single tavern from operating), with *Club Misty, Inc. v. Laski*, 208 F.3d 615, 621–22 (7th Cir. 2000) (due process violated by local referendum that stripped plaintiffs of liquor licenses). We can imagine situations where a public employee is terminated under the ruse of a statutory amendment designed to avoid the protections of the Due Process Clause. We express no view on whether a plaintiff in other circumstances might be able to make out a constitutional claim. We hold only that plaintiffs have failed to demonstrate a clearly established right that was violated by legislation ending their six-year terms as arbitrators. Defendants are entitled to qualified immunity.

The district courts' judgments are AFFIRMED.